UNITED STATES, Appellee

v.

SAM YOUNG, Private–2, U. S. Army, Appellant

2 USCMA 470, 9 CMR 100

No. 1015

Decided May 8, 1953

LT COL George M. Thorpe, U. S. Army, and 1ST LT Floyd V. Hull, Jr., U. S. Army, for Appellant.

LT COL Thayer Chapman, U. S. Army, and 1ST LT Eugene L. Grimm, U. S. Army, for Appellee.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused was tried by a general court-martial in Korea upon two charg- es each containing only one specifica- tion. The first charge alleged a will- ful disobedience of an order given by

**471**

a superior officer in violation of Article 90 of the Code, 50 USC § 684. The second charge alleged desertion with intent to avoid hazardous duty contrary to the provisions of Article 85 of the Code, 50 USC § 679. He pleaded not guilty to both charges but was found guilty and sentenced to be dishonorably discharged from the service, to forfeit all pay and allowances and to be confined at hard labor for twenty years. The convening authority approved the findings and sentence but reduced the period of confinement to ten years. The board of review in the office of The Judge Advocate General, United States Army, affirmed.

Accused's petition to this Court for a review of his convictions and sentence was granted by us. The order granting the review specifically limited the issue to whether the admission of two depositions in evidence during the trial of the accused was prejudicial error.

Omitting any reference to the contents of the depositions, the evidence of the prosecution on the desertion charge tended to establish that on December 9, 1951, the accused was a rifleman in Company "L," 15th Infantry Regiment, which was in combat against the enemy in Korea. The company was, at that time, manning the main line of resistance with only the outpost line of resistance between it and the enemy. At the time the members of the company were engaged in constructing bunkers and preparing foxholes. Accused was supposed to be assisting in that work and was seen by several persons in the company area around noon. At approximately 8 o'clock that night he could not be found, although a search was conducted for the purpose of locating him. No one had given him permission to be absent. In his testimony accused admits he left the front lines around noontime on that date but contends he was directed to the battalion S–1 section to sign some papers and that after executing the necessary document he proceeded to an area further to the rear. He concedes the latter journey was unauthorized.

On the willful disobedience charge, and again making no reference to the testimony in the depositions, the evidence shows that at about 5 o'clock in the afternoon on December 9, 1951, Lieutenant John C. Ledin saw accused at "L" company rear command post which was about three to four miles to the rear of the front line and inquired as to his reason for being absent from his unit. The accused stated that he had returned to the rear to receive medical treatment for his arm. Lieutenant Ledin ordered the accused to return immediately to his position on the main line of resistance. The accused replied that he would not go without medical treatment of his arm and he refused to leave the rear area. He had been examined on six or seven occasions because he claimed his feet and arm were causing him discomfort. The examinations disclosed a mild case of flat feet and a well-healed wound on the arm but the medical experts did not believe accused needed any treatment.

The offenses herein were charged as violations of Articles 85 and 90, Uniform Code of Military Justice, supra. Both of these Articles provide that where the offense is committed "in time of war" the accused may be sentenced to death or as a court-martial may direct. While we have not specifically interpreted the phrase in relation to the Korean conflict, we are of the opinion that for purposes of construing and interpreting the Uniform Code of Military Justice, we are operating in time' of war. However, we can reserve that precise question for development at a later time because the Government concedes this to be a capital case and we shall accept that concession. We, therefore, turn to a discussion of the admissibility of the depositions.

The admissibility of depositions in court-martial cases is controlled by Article 49(d), (e), and (f), Uniform Code of Military Justice, 50 U. S. C. § 624, which provides as follows:

"(d) A duly authenticated deposition taken upon reasonable notice to the other party, so far as otherwise admissible under the rules of evidence, may be read in evidence before any military court or commission in

472

any case not capital, or in any proceeding before a court of inquiry or military board, if it appears—[requirements conceded]

. . . . . .

"(e) Subject to the requirements of subdivision (d) of this article, *testimony by deposition may be adduced by the defense in capital cases.*

"(f) Subject to the requirements of subdivision (d) of this article, a deposition may be read in evidence *in any case in which the death penalty is authorized by law but is not mandatory,* whenever the convening authority shall have directed that the case be treated as not capital, and in such a case a sentence of death may not be adjudged by the court-martial." [Emphasis supplied.]

Paragraph 145(a), Manual for Courts-Martial, United States, 1951, contains the following provision:

". . . Under the provisions of Article 49f, a case in which the death penalty is authorized by law but is not mandatory for an offense of the kind charged is not capital whenever the convening authority shall have directed that the case be treated as not capital. . . . ."

It also makes the following statement:

". . . . With the express consent of the defense made or presented in open court, but not otherwise, the court may admit competent deposition testimony not for the defense in a capital case. . . ."

Thus, under the Code provision and the requirements of the Manual, one of two conditions must be complied with to permit introduction, by the prosecution, of testimony in depositions in cases involving capital offenses. The first requires action on the part of the convening authority prior to trial directing that the case be treated as noncapital, in which event the death penalty may not be imposed. The second is met by the accused expressly consenting to its admission.

In the instant case there was no direction by the convening authority that the case be treated as not capital. The advice of the staff judge advocate recommending that the accused be tried by general court-martial shows that the maximum punishment which could be imposed for the offenses charged was death. The record shows no action prior to trial on the part of the convening authority and no circumstance is apparent which would remove the cause from that class. Hence, the restrictions applicable to the use of depositions in such cases must govern unless the accused consented to their use.

Appellate Government counsel seek to defend the admission of depositions on the theory of consent because of the statement of defense counsel to the effect that they had no objection to their admission. When the first deposition was offered, the law officer asked trial counsel the reason for offering the evidence by deposition. The trial counsel answered that the witness had been rotated whereupon defense counsel stated that he had no objections to its admission. When the second deposition was introduced and read defense counsel objected to one interrogatory. His objection was sustained and that question and its answer were deleted. Thereafter the law officer asked if defense counsel had any other objections to make and the latter replied that he had none. Under certain circumstances this would be considered as a waiver but the wording of the Manual suggests an affirmative act showing positive relinquishment of the right to have the depositions excluded. It is not shown clearly that accused and his counsel were consciously aware of the inadmissibility of the evidence because he was charged with a capital offense. The depositions contained evidence which was not helpful to the accused and he could not gain any benefit from their introduction. On the other hand, an objection to their admission might have resulted in some advantage to him, as undoubtedly had the matter been called to the attention of the convening authority he would have ordered the case tried as a non-capital offense. In view of this it seems fair to assume that all parties participating in the trial failed

**473**

to appreciate that the testimony given in the depositons was inadmissible because the offenses charged carried death sentences, and in the light of the negative rather than the positive approach taken by the parties, that the "express consent" envisioned by the framers of the Manual was not present. We, therefore, conclude it was error to admit the depositions and have their contents read to the court-martial. Previous service rulings support this conclusion. In United States v. Hatfield, 58 BR 9, an Army board of review considered a similar situation under a substantially similar provision contained in the Manual for Courts-Martial, U. S. Army, 1928. There the board held:

"The failure of defense counsel to object to the introduction of a deposition against an accused in a capital case does not constitute express consent to its use and a waiver of accused's rights under Article of War 25 (MTO 6543, Thacker; MCM, 1928, par. 119a). Even if a statement by defense counsel that he has no objection to the introduction of a proffered deposition should constitute something more than a failure to object, nevertheless it falls far short of constituting the express consent here requisite. In our opinion the defense can be said to have expressly consented to the introduction of a deposition against an accused in a capital case only if the defense in clear and unequivocal terms expressly agrees to waive the accused's rights under Article of War 25. Not only does the brief statement of defense counsel here fail expressly to state that accused's rights under Article of War 25 were waived but furthermore it is not even clear that defense counsel realized that accused possessed particular rights under that Article of War. Accordingly, we are of the opinion that these depositions were improperly admitted in evidence. . . ."

Having held the admission erroneous, we turn to a discussion ■ of its prejudicial effect under Article 59a of the Code, 50 U. S. C. § 646. Appellate Govern-

**474**

ment counsel have advanced the contention that the evidence on each of the offenses outside and independent of the respective depositions was of such quality and quantity as to compel a finding of guilty and that the evidence contained in the depositions was comparatively so insignificant and minor that it added little or nothing to the prosecution's case. This is the rule announced in the Manual for Courts-Martial, United States, 1951, and it does not differ in substance from the one announced by us. Under both rules it is our duty to search the record to determine whether the incompetent evidence could have reasonably had any impact on the minds of the members of the court-martial.

In connection with the offense of desertion to avoid hazardous duty we find the accused taking the witness stand to testify. His version was that he left the front lines to report to the battalion S–1 section to sign some papers; that his section was from one and one-half to two miles to the rear of his assigned position; that when he left, instead of returning to his assigned post, he proceeded in the opposite direction and arrived at, and stayed in, the rear command post of the company the rest of that day and all of the next; and that this area was from four to five miles to the rear of his station.

It is suggested that the deposition given by a lieutenant who was company executive officer adds weight to the Government's case on this offense. In substance he stated that he was with the forward elements of the company; that at about 7:30 p.m. on December 9, 1951, he received a report concerning the accused but did not order a search to be made; and that he did not see the accused between that time and 7:00 a.m. the following morning. This is the extent of his testimony and it in no way conflicts with or detracts from the story as told by the accused. On the contrary, it has a tendency to corroborate his version. Certainly the officer could not have seen the accused during that particular period of time because the accused was in the rear area. If any consideration was given to this tes-

timony it would not contradict the evidence given by the accused nor affect his credibility. The only item of importance in the deposition was consistent with the defense advanced by accused.

We turn now to the second specification and the evidence in the depositions which might have influenced the findings of guilt. The accused did not testify on this specification but the issue revolved solely around his contention that he would not go forward because of his physical condition. In his testimony on the other charges he had conceded he was at the rear command post at the time the order was supposedly given and that he remained there the remaining portion of that day and all of the next. The officer who gave the order testified to the surrounding circumstances. These consisted generally of asking the accused why he was not forward with the combat elements of the company and receiving a reply that he needed medical attention for his arm; that a direct order was given to accused to report back to Lieutenant Smith at the forward command post and to leave immediately; that the accused stated he would not return until he received medical attention; and that the order was never obeyed.

The testimony of the lieutenant was corroborated, in every detail, by a Private First Class Hoffman who was present and heard the order and the reply. He testified as to the contents of the order, accused's statement that he would not return until he received medical treatment for his arm, and to the presence of accused in the rear area for at least two days.

The evidence set forth in the second deposition was furnished by a sergeant who, prior to the time of trial, had been sent back to the United States on rotation. His testimony merely affirmed the version told by the other two witnesses in that he stated the lieutenant gave the order to return and accused stated he would not do so without first being medically treated.

·The question thus posed is: Conceding the evidence to be incompetent, could it reasonably have any impact on the minds of the members of the court, either as to findings or sentence? We believe not. Even when we magnify it out of all proportion to its importance in relation to other evidence, it still appears to have been uninfluential. A fair interpretation of the record discloses that the accused had two possible defenses to this specification. First, he was not given an order; and second, if he was, he had a justifiable reason for disobeying it. The deposition deals with the latter in a way not unfavorable to the accused in that it helps to establish he was positive in maintaining he had good cause for not complying. Therefore, if there could be any ˙prejudicial effect it would be that the evidence of the sergeant influenced the court members in their findings as to whether any order was given. On this element we have no dispute in the testimony. The evidential posture of the case without the deposition was this: Two witnesses had testified to the giving of the order. There was no attack on their credibility, no discrepancies between their versions, no conflict in their testimony to reconcile, no inherent inconsistencies or improbabilities in their evidence and at least one of these witnesses was without any reason to be biased or hostile. The defense in no way denied, weakened nor rendered doubtful the facts related by these witnesses and certainly it cannot be asserted successfully that the Government placed before the court-martial inconsistent versions. Under these circumstances if the court-martial was to find against the Government on that issue it would be without reason, justification or excuse. Any fair-minded and reasonable person would have been compelled to find against the accused with or without the evidence contained in the deposition. Accordingly, we find error, but even though we test for the presence of prejudice by any rule announced in any case, we still are unable to find it present here.

The rule announced is not incon-

sistent with previous military cases and it parallels the ci-■■■■■■■ ■ vilian rule. The view adopted in the military is best expressed in United States v. Hatfield, supra. The board of review which reversed that case had this to say in explanation of its decision:

"When a conviction of an accused rests upon both competent and incompetent evidence, the conviction can only be sustained if the competent evidence is of such quality and quantity as practically to compel in the minds of conscientious and reasonable men the finding of guilty. If the incompetent evidence is eliminated from the record and the competent evidence remaining is not of such probative force as virtually to compel a finding of guilty, the finding must be disapproved (Dig. Op. JAG 1912–30. sec. 1284, p. 634; CM ETO 1693, Allen). It is not enough that the competent evidence, if standing alone in the record of trial, would have tipped the scales against accused and warranted the court's finding of guilty; the competent evidence itself must be so conclusively determinative of the issues involved that there exists no reasonable prospect that the court's findings would have been different had the incompetent evidence not been before it (CM ETO 2625, Pridgen)."

It is difficult to find identical civilian cases, but the general principle dealing with the admission of incompetent evidence is announced in many Federal decisions. For reasons of brevity I quote from only two. In Honeycutt v. United States, 277 Fed 941, the Circuit Court of Appeals (Fourth Circuit) stated:

". . . It seems clear that the court erred in admitting for any purpose the checks illegally seized in the execution of a search warrant and ordered returned to the defendant. Boyd v. United States, 116 U. S. 616, 6 Sup. Ct. 524, 29 L. Ed. 746; Weeks v. United States, 232 U. S. 383, 34 Sup. Ct. 341, 58 L. Ed. 652, L.R.A.1915B, 834, Ann. Cas.

1915C, 1177; Silverthorne Lumber Co. v. United States, 251 U. S. 385, 40 Sup. Ct. 182, 64 L. Ed. 319; Gouled v. United States, 255 U. S. 298, 41 Sup. Ct. 261, 65 L. Ed. 315; Honeycutt v. United States, 277 Fed. 939 (filed November 17, 1921). But it seems equally clear that the error was harmless, in that the introduction of the checks added nothing to the probative force of the evidence already adduced. The statement copied from the record shows that the defendant testified without objection to the purchase of the stolen goods late at night from boys, who carried them to his country store in the automobile, to the giving of checks for the purchase money, and to writing on the face of the checks 'for labor.'

"The checks themselves evidence nothing whatever that the defendant had not already testified to, and added nothing to the force of the evidence already adduced against him. A judgment should not be reversed, on appeal, for error which could not have affected the result. Lancaster v. Collins, 115 U. S. 222–227, 6 Sup. Ct. 33, 29 L. Ed. 373; Judicial Code, § 269 (Comp. St. Ann. Supp. 1919 § 1246); Dye v. United States (C.C.A.) 262 Fed. 6; Sneierson v. United States (C.C.A.) 264 Fed. 268."

In Jones v. United States, 296 Fed 632 (CA 4th Cir), the Court in sustaining a conviction stated:

"Conviction on the charge of having in possession intoxicating liquor on May 2, 1922, was sustained by proof of possession at any time before the finding of the indictment. Ledbetter v. United States, 170 U. S. 606, 18 Sup. Ct. 774, 42 L. Ed. 1162. This proof was furnished by the evidence of the defendant himself that he had sold liquor on May 6, 1922. This evidence bearing directly on the issue was as competent coming from the defendant as from any other witness. In view of this conclusive proof of the charge, the judgment would not be reversed for error in the admission of other evi-

**476**

dence. Dye v. United States (C.C.A.) 262 Fed. 6; Honeycutt v. United States (C.C.A.) 277 Fed. 941; Sneierson v. United States (C.C.A.) 264 Fed. 268; Chicco v. United States (C.C.A.) 284 Fed. 434. It is therefore immaterial whether the evidence obtained by search was improperly admitted."

Under the provisions of the Code and the Manual evidence contained in depositions is admissible in all trials except those involving capital offenses. Congress, solely because the death penalty may be imposed, made their contents incompetent in that class of cases. The incompetency does not arise for any reason of unconstitutionality or because of any probability that the testimony is untrustworthy as that type of testimony should not be used to prove any offense. Because the nature of the testimony contained in the depositions is such as to have no impact on the minds of members of the court-martial, we conclude their admission did not materially prejudice the substantial rights of the accused.

The decision of the board of review is affirmed.

Chief Judge QUINN concurs.

BROSMAN, Judge (concurring in the result):

I concur in the result reached by my brothers in this case.

I had no difficulty at all in accepting the majority opinion up to and including its determination that the depositions in this case were illegally admitted, and that the accused did not consent to their use. At this point it became necessary for me to inquire whether the problem was to be controlled by United States v. Clay (No. 49), 1 CMR 74, decided November 27, 1951, or whether the record should be searched for prejudice, in accordance with the provisions of the Uniform Code of Military Justice, Article 59(a).

In Clay, of course, this Court enunciated the doctrine of military due process, and set down a non-exclusive enumeration of its elements. Among these the following was expressly included: "[the right] to be confronted by witnesses testifying against him." I am sure that if Clay is to govern, a search for specific prejudice is quite unnecessary—as I sought to demonstrate in my separate concurrence in United States v. Woods and Duffer (No. 1023), 8 CMR 3, decided February 19, 1953. We intended to provide to this effect in Clay; we did so provide; and we should have done so.

However, I am sure that to the principle of confrontation, as guaranteed through the concept of military due process, the use of depositions in a *proper* case must be deemed a statutory exception. Uniform Code, supra, Article 49(d). My chief concern here, therefore, has been one of whether their use has also been excepted in an *improper* one. Two approaches to this question are possible. Under the first, the exception must be construed strictly—with the result that instances of use outside its limits must be regarded as violating confrontation guaranties. The second demands a more liberal construction. Under this view we start with a statutory provision, unknown to the Federal civilian practice, generally excepting the use of depositions by the Government in criminal cases from the operation of the principle of confrontation—with the result that the present problem becomes, not one of a violation of military due process, but instead something much less fundamental: the mere limitational determination and administration of a rule of law.

I have determined that the adoption of the latter analysis is demanded. It follows that we must evaluate the error in terms of fair risk of prejudice to the accused. Like my brothers, I find none here. For myself, however, I shall incline to administer the notion of prejudice quite tightly in this setting. Unless it is perfectly clear that the accused could not possibly have been harmed, the present error should be regarded as reversible. Motes v. United States, 178 U. S. 458, 44 L ed 1150, 20 S Ct 993.