UNITED STATES, Appellee

v.

IRWIN W. ANDERTEN, Major, U. S. Air Force, Appellant

4 USCMA 354, 15 CMR 354

No. 3122

Decided May 28, 1954

Franklin H. Pierce, Esq., COL Kenneth B. Chase, USAF, and CAPT Daniel O'Leary, USAF, for Appellant.

LT COL Harold Anderson, USAF, and 1ST LT Anthony Ortega, Jr., USAF, for Appellee.

GEORGE W. LATIMER, Judge:

The nature of the issues upon which accused's petition for review was granted in this case limits our discussion to the offense of absence without leave, one of the offenses of which the accused now stands convicted. Accordingly, only a brief statement of the case is required.

At the time of the events herein related, the accused was stationed in Okinawa. On May 21, 1952, he was informed that charges had been lodged against him for violation of Article 121, Uniform Code of Military Justice, 50 USC § 715. There were three specifications under the charge, each alleging larceny by check. On May 30, 1952, accused requested, and orders were issued authorizing him temporary duty with Headquarters, Far East Air Forces, APO 925, for approximately five days, for the purpose of securing civilian legal counsel. On June 21, 1952, he was apprehended in Tokyo, Japan, and returned to his unit on June 24, 1952. After his return, three additional charges were brought against him. The first additional charge alleged desertion founded on an unauthorized absence with intent to remain away permanently in violation of Article 85 of the Code, 50 USC § 679. The second and third additional charges alleged twenty-two additional offenses of larceny by check under Article 121 of the Code, supra. The court-martial returned findings of guilty of wrongful appropriation on two of the specifications under Charge I, guilty of absence without leave under the first additional charge, and guilty as charged in the second and third additional charges. Accused was sentenced to be dismissed from the service, to forfeit all pay and allowances, and to be confined at hard labor for three years. The convening authority reduced the period of confinement to one year, and approved the findings and the sentence as reduced. The board of review set aside the findings of guilty under the second and third additional charges, affirmed the other findings, and approved the sentence after reducing the period of confinement to eight months. We granted the accused's petition for review in order that we might pass upon two issues, namely, whether depositions were admissible to prove the crime of desertion, and whether the evidence is sufficient to support the conviction of the included offense of absence without leave.

Article 85, Uniform Code of Military Justice, supra, under which the desertion charge was laid, provides that when the offense is committed "in time of war" the accused may be punished "by death or such other punishment as a court-martial may direct." It is now well settled that, for purposes of interpreting the provisions of the Uniform Code of Military Justice, the Korean conflict is "time of war," United States v. Bancroft, 3 USCMA 3, 11 CMR 3. Furthermore, a desertion committed during such time is a capital offense, United States v. Gann, 3 USCMA 12, 11 CMR 12. Article 49(f) of the Code, 50 USC § 624, provides that depositions may not be received in evidence against an accused in a capital case, but a case is not considered as being capital when the convening authority has directed that it be treated as noncapital. See United States v. Young, 2 USCMA 470, 9 CMR 100; United States v. Horner, 2 USCMA 478, 9 CMR 108; and United States v. Aldridge, 4 USCMA 107, 15 CMR 107.

In the case at bar eighteen depositions, introduced by the prosecution, were received in evidence. At least five of those dealt solely with the charge of desertion. In addition, some of the others, although primarily concerned with the larceny offenses, indicated by the dates given and places named that the accused was absent from his station during the period involved. Appellate defense counsel attack the use of the depositions on the ground that the charge of desertion was a capital offense which was not rendered noncapital by appropriate action by the convening authority.

The assigned error is predicated solely on an alleged omission in the

357

indorsements referring the charges for trial. The charges, which had been previously referred to another court-martial on June 11, 1952, were withdrawn from that court and referred to the one which tried the accused; but the indorsements contained no special instructions with respect to any limitations on sentence. Appellate defense counsel contend that, if the convening authority intended that the case be treated as noncapital, he should have so stated in the order of reference. To support this contention, we are referred to paragraph 33*j*(1) of the Manual which provides:

"Charges are ordinarily referred to a court-martial for trial by means of the indorsement on page 3 of the charge sheet (app 5). Although the indorsement is usually completed on all copies of the charge sheet, only the original need be signed. The indorsement may include any proper instructions; for instance, a direction that the charges be tried with certain other charges against the accused (24*b*), or in a common trial with other persons (33*l*), or that a capital case be treated as not capital (15*a*(3); Art 49*f*)."

Although the language of the quoted paragraph is permissive rather than mandatory, we believe the better practice is to comply strictly with the quoted provision. However, we do not believe that in all instances failure to do so requires us to hold that a case is capital. Neither do we believe the failure to follow precisely the prescribed procedure in this instance renders the depositions inadmissible. Article 34(*a*) of the Uniform Code of Military Justice, 50 USC § 605, provides:

"(*a*) Before directing the trial of any charge by general court-martial, the convening authority shall refer it to his staff judge advocate or legal officer for consideration and advice."

This is amplified by the provisions of paragraph 35*c* of the Manual which states:

"*Action of the staff judge advocate or legal officer.*—The advice of the staff judge advocate or legal officer shall include a written and signed statement as to his findings with respect to whether there has been substantial compliance with the provisions of Article 32, whether each specification alleges an offense under the code, and whether the allegation of each offense is warranted by the evidence indicated in the report of investigation; it shall also include a signed recommendation of the action to be taken by the convening authority. Such recommendation will accompany the charges if they are referred for trial. See 44*g*(1) and *h*."

Here the allied papers show that the accused was informed of the original charge against him on May 21, 1952. This charge involved only three specifications of larceny by check, and the offenses alleged were noncapital. On June 12, 1952, this charge was referred to a court-martial for trial, but at that time the accused was absent from his station, and the charge was withdrawn and later referred to the court-martial which tried the accused. After his return to his unit on June 24, 1952, investigation of the additional charges was instituted. These additional charges included the capital offense of desertion. After an appropriate pretrial investigation, the record was referred to the staff judge advocate for his advice and recommendation. He noted that a capital offense was involved and his report to the convening authority contained the specific recommendation that the additional charges be treated as noncapital. This recommendation was approved in writing on the report by the convening authority prior to trial. It accompanied the charges and became part of the record. Accordingly, we find a written direction by the convening authority that the case was not to be processed as a capital case. Moreover, because the direction accompanied the charge sheet, we have reason to believe that the necessary court personnel were informed as to the limitations on the punishment. Certainly the record of trial bears testimony to the effect that all personnel at the trial

level considered the case as being a noncapital prosecution.

There is military authority for the proposition that a direction in writing filed as part of the allied papers is sufficient to render a case noncapital. In United States v. Duncan [ACM S–1180] 4 CMR(AF) 357, an Air Force board of review stated:

"The letter of 4 January 1951 appears in the allied papers accompanying the record of trial proper. This was an appropriate place for it to appear. It is not legally essential that such a direction by the officer authorized to appoint a general court-martial to be a part of the record of trial proper in order for it to be considered in determining whether the court had jurisdiction, the decisive point being that the direction was in fact given (ACM S–1150, Jones, 4 CMR 345; ACM 13, Baggett, 1 CMR 16, 22)."

The instant case is much stronger than the reported case for the reason that the direction given is included in a document which the Manual directs must accompany the charges. Assuming in this instance a variance from normal procedure, we find the error, if any, to be one of form and not one of substance. The first assignment of error is, therefore, overruled.

As to the contention that the evidence is insufficient to support the findings of guilty of absence without leave, appellate defense counsel rely primarily upon the inadmissibility of certain extract copies of morning reports which were received in evidence. Seemingly the alleged inadmissibility is founded on two assertions: first, the entries are not consistent, and, second, the words "corrected entries" are not marked on some. As a starting point, we mention the fact that the evidence for the Government establishes overwhelmingly that accused was absent without leave for some period of time, and the evidence for the accused does not show otherwise. The only possible points of dispute are the dates of inception and termination of the absence. For purposes of clarity, we list the exhibits that affect the commencement date and then those showing the end of the absence period. On June 16, 1952, a morning report entry was made showing that on June 9, 1952, the accused's status changed from duty to absence without leave. Subsequently, by an entry dated July 7, 1952, the change of status was shown as effective on May 31, 1952. Again, an entry dated October 10, 1952, shows the accused was transferred from duty to absence without leave effective June 6, 1952. We thus have three separate entries showing three separate commencement dates. An entry dated June 24, 1952, indicates that the accused returned and was transferred from absence without leave to arrest in quarters on that date. A later morning report entry of July 7, 1952, shows his transfer from absence without leave to arrest in quarters on June 21, 1952. On August 25, 1952, another morning report entry was made showing that the accused was awaiting transfer to Okinawa on June 21, 1952, and that his status was changed from absence without leave to confinement on that date.

We first dispose of the contention that all reports were inadmissible because they were not prepared in accordance with Air Force regulations. Concededly, official documents should be prepared in accordance with law but every omission does not destroy their admissibility. Only those material to the execution of the documents could have that effect. Here we are not confronted with a material omission for the reason that, if it becomes important to determine which are the primary entries and which are the corrected entries, we need go no further than refer to the dates of the reports. It hardly needs saying that the first entries in point of time on commencement and termination cannot be corrected entries. Assuming the later ones are, and therefore incompetent, we find no reason to discard the first as they were prepared according to the regulations and they meet all the tests of officiality. However, rather than skirt the issue, we hold that failure to type on a subsequent report the words "corrected entry" does not of itself ren-

der the report unofficial and inadmissible. While those words might expedite the paper work in the service, there is substitute evidence on the document itself which furnishes the same information.

The next point of attack is that the entries are not consistent with each other. This need be conceded only if we ignore the dates, but assuming we do that, the variances only affect their weight. We have previously disposed of the question of the admissibility of official documents shown to be inaccurate. In United States v. Phillips, 3 USCMA 557, 13 CMR 113, we stated:

". . . It is entirely possible that the special order issued by that Headquarters could have been amended by shortening accused's period of leave by five days and if that had happened, then the morning report entry would bespeak accuracy. However, there is a greater possibility that the reporting officer inadvertently used the EDCSA date instead of the reporting date for the commencement of the absence. We shall discard the first possibility and assume the officer making the entry advanced improperly the time of the absence without leave by five days. While we concede an inaccurate entry would affect the weight to be given the exhibit, we are unable to follow the argument that it would render it inadmissible."

Whether these particular entries are entitled to any weight must be considered in the light of the reasons advanced for changing the dates. The reporting officer and the base legal officer testified as to the background of each of the three dates of inception of the absence. In each instance the information upon which accused's reported absence was based came from appropriate sources and the reasons for the uncertainty were apparently occasioned by the activities of the accused. He was given temporary duty for approximately five days. However, he never entered upon the duties for which he was authorized travel. The original entry was based on the orders and a reasonable time for return travel after the prescribed period had elapsed. Subsequently, doubt arose about crediting the accused with the time covered in the orders and it was concluded that he was not entitled to the temporary duty time because he did not attempt to perform his mission. Further consideration caused the appropriate authorities to give him credit for this period, but apparently no travel time for return was allowed as accused was apprehended and returned under guard. A plausible case could be made to justify any of the three entries, but the court-martial resolved the discrepancies by finding inception at the latest of the three dates. This was beneficial to the accused and he cannot justly complain.

Some difficulty was likewise encountered by his unit in determining the correct date of termination of the absence. The first entry discloses a return date of June 24, 1952. This was predicated on the time he was physically returned to his unit. The second entry credited him with return to the Air Force on the day he was apprehended in Tokyo. The last entry combined the information contained in the others. Again, the court-martial made a finding beneficial to the accused as it found his return to have been on the earliest recorded date.

Even were we to discard the morning entries, we would still be compelled to hold that the record is sufficient to establish all the necessary elements of the offense of absence without leave. Evidence aliunde the reports, establishes that on May 29, 1952, the accused requested permission to go to Tokyo, Japan, for the purpose of employing civilian counsel to aid in his defense to charges pending against him. Pursuant to that request temporary duty orders for approximately five days were issued to the accused on May 30, 1952, and he left Okinawa for Tokyo. He arrived in Tokyo on May 31, 1952, and had he made reasonable efforts to obtain counsel, it is reasonable to assume he would have returned within the prescribed period. However, from that date until his apprehension there on June 21, 1952, he left military channels and lived as a guest in the Hotel

Waldorf in Tokyo. He originally signed in as a guest at Army Hall Far East Air Forces on May 31, 1952, and left a deposit to guarantee payment of his room. He, however, did not return to those quarters and he was checked out by an Air Force clerk on June 10, 1952, and his account was closed. While the accused took the witness stand, he limited his testimony to the larceny charges. However, he admitted cashing a number of checks in Tokyo and many of these were dated after his five-day period of temporary duty had expired. His stay at the Waldorf Hotel was interrupted by his being taken into custody on June 21, 1952, by an agent of the Office of Special Investigation. Accused first informed the hotel proprietor that he intended to stay for one week, but he later told the same individual he would remain for thirty days, yet he never originated any request to any military authority that his orders be amended to permit such a lengthy stay. There is no showing that he contacted any civilian counsel nor that he needed more than the five days time to complete his mission. There was air transportation available back to his own station during the entire period of time and ample space to accommodate him. During his twenty-one days venture, he cashed checks in the approximate amount of $1,100.00 and apparently the funds were used for social purposes. The original temporary duty order was requested by the accused, and we assume he had some reasonable basis for concluding that five days would be ample time to accomplish his purpose. The fair import of the orders is to allow him that period. A precise period is not prescribed as the time may be shortened by accomplishing the mission sooner than expected or extended because unexpected difficulties make it impossible to return on the exact date. Neither of those contingencies are present in this case because the accused elected to squander his time for purposes other than those contemplated by the orders. He can hardly argue he was unable to complete his task, and that he in good faith attempted to return at the earliest practicable time, but was prevented from so doing by circumstances beyond his control.

Moreover, his experience in the service was of sufficient length and variety that he must have known that if orders do not provide sufficient time to complete a task, an approved extension must be obtained. When we assemble all of the facts and circumstances together, aside from the morning report entries, we find ample evidence to sustain a reasonable person in finding that the accused was absent without authority from June 9, 1952, until June 21, 1952. This was the finding returned and it must be sustained.

The decision of the board of review is affirmed.

BROSMAN, Judge (concurring in the result):

I concur in the result reached by Judge Latimer.

II

The Manual for Courts-Martial, United States, 1951, paragraph 33j(1), in discussing the manner in which charges are to be referred for trial, indicates that the order of reference—customarily indorsed on page 3 of the charge sheet—"may" include a direction that the case be treated as noncapital. Clearly this Manual wording is permissive, not mandatory. Cf. United States v. Merritt, 1 USCMA 56, 1 CMR 56; United States v. Emerson, 1 USCMA 43, 1 CMR 43 (interpreting paragraph 33j(1), supra). In the case at bar, the convening authority placed this direction on the pretrial report of his staff judge advocate. It is required that this report accompany the charges when referred for trial, and thereafter be attached to the original record. See Manual, supra, paragraphs 35c, 82b(5). In my view this action of the convening authority sufficed to render admissible the several depositions offered against the accused at his trial. See Article 49(f), Uniform Code of Military Justice, 50 USC § 624.

In cases under the 1949 Manual, boards of review held that, under a variety of circumstances, a direction by the convening authority that charges be treated as noncapital was fully effective,

**361**

although it did not appear in the record of trial proper. United States v. Jones [ACM S-1150], 4 CMR(AF) 345; United States v. Duncan [ACM S-1180], 4 CMR(AF) 357. Observing that paragraph 34*g* of the 1949 Manual contains language similar to that found in the current paragraph 33*j*(1), I doubt that the provisions of the 1951 Manual were designed to alter this principle. And I find nothing in the Code itself which would effect such a change.

The decision of the convening authority was conspicuously displayed on the final page of a document required by law to accompany the charges themselves. It is mandatory that this document be made available by trial counsel to defense personnel. Manual for Courts-Martial, United States, 1951, paragraph 44*h*. Accordingly, if defense counsel—two military lawyers and a civilian attorney—performed their duties with even modest competence, they must have known that the case was to be regarded as noncapital. That they did, in fact, possess this knowledge is inferable from the absence of objection to the numerous depositions offered in evidence by the Government.

Conceivably the law officer did not know of the convening authority's decision—although it is improbable that he would have accepted the depositions in evidence without assurance that the case was not a capital one. The dissenting judge suggests that the law officer's unawareness of the convening authority's action is made apparent by his instruction prior to sentence that the accused might lawfully be punished "as the court may direct." In Articles 78–132, the Uniform Code provides at many points that an accused shall be "punished as a court-martial may direct." There this phrase is used to signify any punishment *exclusive of capital punishment*—and when a death sentence is authorized the Code *explicitly* so provides. The wording of the instruction is so similar to that of the Code as to suggest that—although somewhat ambiguous on its face—the law officer clearly did not mean in it to inform court members that they were permitted to impose a death sentence. Moreover, it is to be noted that the accused had

been acquitted of desertion—the only capital offense charged—at the time the instruction was given. Thus, it seems particularly difficult to construe the law officer's charge in such a manner as to authorize the death penalty. And certainly the premise for the assertion that the law officer was unaware of the convening authority's direction is wholly destroyed.

In any event, I feel little concern about the law officer's possible unawareness of the convening authority's decision, since—as previously indicated—I am sure that defense counsel *did* know of that direction. Thus, it became their responsibility to advise him of the convening authority's order—if they had reason to believe that he was unaware of it, and that it was important for him to possess this information. Actually it is unlikely that they would have seen any point in assuring themselves that the law officer was informed in this regard. In ruling on the admissibility of the depositions, the law officer would in no wise have been moved to act to the accused's advantage through knowing that the case was noncapital. Quite the contrary. Moreover, in advising the court on sentence, it was quite immaterial whether he knew that the convening authority had designated the case as noncapital, for, on the findings of guilty of the lesser offense rendered by the court, the accused could not possibly have been sentenced to death—regardless of any sort of action by the convening authority. In short, I find no basis for saying that it should now be open to the accused to raise at the appellate level a contention that the convening authority used a permissible but imperfect form for directing that the case be treated as noncapital—no question having been raised at the trial.

That which has preceded is certainly not intended to suggest that a convening authority is well advised to make use of a method for designating a case as noncapital other than that provided in paragraph 33*j*(1) of the Manual. And, of course, had the circumstances raised any doubt that such a direction had been given before trial, I would not falter in holding inadmissible all depositions received against the accused

without his consent. Actually the risk of prejudice from ignorance on the part of trial personnel that a case has been denominated noncapital is one chiefly borne by the Government. In the presence of such unawareness, the prosecution presumably will not offer depositions against an accused. Too, the law officer would reject any such, if offered —and this despite the absence of objection by the accused. United States v. Young, 2 USCMA 470, 9 CMR 100. On the other hand, the defense's presentation of evidence would be unimpaired—since its personnel may offer depositions in evidence regardless of whether the case is capital. Uniform Code, Article 49(e). Admittedly an erroneous instruction on the maximum sentence imposable could conceivably prejudice an accused. However, this risk is insufficient to demand a judge-made rule to the effect that, not only must the convening authority have "directed" that the case be treated as noncapital, but also that his direction must be incorporated in the record of trial proper—this in order that the Government may introduce depositions against an accused.

### III

Extracts from three morning reports of the permanent organization of the accused were offered by the Government to establish the inception of the alleged unauthorized absence. The first of these was dated June 16, 1952, and reported the accused in a status of absence without leave effective June 9, 1952. The remaining two documents covered later periods, but indicated initial dates earlier than June 9. One ▇▇▇▇▇▇▇▇▇ salvo fired against these morning reports is that they were inadmissible because prepared by the accused's unit of assignment rather than his organization of attachment. This blast misses its mark, since Air Force directives require that an airman's or officer's status be recorded by both his unit of assignment *and* attachment. Personnel Accounting Manual, AFM 171–6, as amended, chapter 1, paragraph 8f(1); chapter 4, paragraph 2d(1)(a); United States v. King [ACM S–4998], 8 CMR 817.

The accused insists further that the presumption of regularity has been destroyed as to these three ▇▇▇▇▇▇▇ papers. The latter two reports—he points out—were shown by the testimony to deal with the identical absence recited in the morning report of June 16. In substance they were corrections; yet they failed to comply with the formal requirements for "correcting entries." See AFM 171–6, chapter 3, paragraph 30. Moreover, he emphasizes that Major Gillis, a legal officer, played an important role in the preparation of the entries in question. The record of trial shows that Major Gillis was originally consulted—together with the base adjutant—concerning the entry to be made in the morning report of June 16. The reasons for this consultation were not at all sinister. Major Gillis had been largely responsible for obtaining approval for the accused to travel to Japan in search of civilian counsel. Thus, he could be expected to understand better than others the purpose of the orders under which the accused proceeded from Okinawa to Tokyo—the interpretation of which orders would determine the latter's duty status. Moreover, Major Gillis would have been in a superior position to determine whether the accused might have been delayed legitimately in his ostensible mission. So far as can be detected, Major Gillis was at this stage no more than an impersonal advisor and consultant—with the consequence that the morning report as to which he offered advice was in no way tainted. Cf. United States v. DeAngelis, 3 USCMA 298, 12 CMR 54.

On the other hand, as to subsequent entries, the record suggests that the Major may have proceeded beyond the role of consultant. In fact, the accused's commander indicated that certain changes were made at the "request" of Major Gillis. That circumstance suggests a deviation from the normal course of personnel accounting —and this deviation in my opinion serves to deprive the latter two morning report extracts of the benefit of any sort of "presumption of regularity." Moreover, the record of trial indicates

**363**

that the corrections were suggested by Major Gillis—the legal officer—chiefly with an eye to the prospective trial of the accused. Cf. Manual for Courts-Martial, paragraph 144*d*. In light of their numerous defects, we must accede to the accused's contention that the latter two morning report extracts were inadmissible.

Since the latter two documents were entitled to no presumption of regularity, they cannot serve to render inadmissible the first morning report extract—that dated June 16, 1952—whose entry they proposed to alter. So far as admissibility is concerned, their effort to advance the inception date of the accused's absence was a nullity. However, although they may be deemed in some way to have infected the original morning report so as to render it inadmissible, the accused is aided but slightly thereby. At the trial the parties presented detailed testimony as to the circumstances surrounding the preparation of the various morning reports, and the information on which had been predicated the three entries reciting the accused's absence. Having before them the very information on which the accused's commanding officer based the entries, the members of the court would scarcely have attributed to those entries some mysterious significance apart from the data from which they stemmed. Thus, the erroneous reception of the morning reports cannot have prejudiced the accused—and the proper inquiry becomes one of sufficiency of the evidence apart from the morning reports.

IV

This inquiry gives me little pause. Certainly I cannot say that the evidence against the accused was insufficient— or less than convincing. I reach this conclusion on the basis of the following considerations: The accused's age, grade and military experience; his failure to request extension of his orders, or to communicate with his home command on Okinawa; the nature of his activities in Tokyo, as revealed by numerous depositions; the failure of the defense to advance any sort of explanation for his failure to return from Japan on available flights; and the accused's additional failure to suggest even remotely that he engaged himself in any way in the service of the purpose which took him to Tokyo.

Therefore, I must concur in affirming the decision of the board of review.

QUINN, Chief Judge (dissenting):

I dissent.

In the absence of the accused's consent, use of depositions by the Government is expressly prohibited in a case in which the death penalty may be imposed, except when "the convening authority shall have directed that the case be treated as not capital." Article 49(*f*), Uniform Code of Military Justice, 50 USC § 624. Both the language of the Article, and our decision in United States v. Young, 2 USCMA 470, 9 CMR 100, make it clear that the prohibition is mandatory. The majority now hold that the notation of approval by the convening authority, endorsed upon the staff judge advocate's pretrial review recommending that the case be treated as not capital, satifies the statute, even though it does not clearly appear that the endorsement was brought to the attention of any of the trial personnel. With that conclusion, I do not agree.

Two consequences arise from a direction that a case be treated as noncapital: (1) a properly taken deposition may be received in evidence against the accused, without his further consent, and (2) the court cannot impose a death sentence. A law officer cannot know that a deposition is admissible, unless he is advised that the convening authority has directed that the case be treated as noncapital. Similarly, a court cannot know that it may not impose a death sentence, unless it is properly instructed at the trial.

The Manual provides that the convening authority may include this vital information in his order referring the case for trial. Manual for Courts-Martial, United States, 1951, paragraph 33*j*(1). Undoubtedly, this method is not exclusive. The language of the Manual is permissive, and there is no compelling reason to regard it as other

than a suggestion of an appropriate form. Consequently, I have no hesitancy in concluding that the convening authority may also utilize a separate letter of instruction, or any other proper means to record his direction. Whatever the form, however, the direction is valueless if it is not brought to the attention of the law officer and the court. An indorsement on the staff judge advocate's pretrial review does not in itself constitute such notice.

In theory and in practice, the staff judge advocate's pretrial review is no part of the court proceedings against the accused. The principal function of the review is to supply the convening authority with competent legal advice as to the charges. Article 34(a), Uniform Code of Military Justice, 50 USC § 605; Manual for Courts-Martial, United States, 1951, paragraph 35, pages 49–50. Although the Manual directs that the recommendations contained in the staff judge advocate's review accompany the charges referred for trial, Manual, supra, paragraph 35c, page 50, it expressly prohibits trial counsel from bringing the review itself to the attention of the court. Thus, paragraph 44g(1) provides as follows (page 64):

"He will take care that any papers in his possession which relate to a case referred to him for trial and which are not in evidence are not exposed to any risk of inadvertent examination by members of the court; nor will he bring to the attention of the court any intimation of the views of the convening authority, or those of the staff judge advocate or legal officer, with respect to the guilt or innocence of the accused, appropriate sentence, or concerning any other matter exclusively within the discretion of the court."

The Manual provisions indicate that the convening authority's direction should be set out independently of the recommendations in the pretrial review. But even if the two are to be considered together, trial counsel should present the recommendation and the approval to the court, so that they appear in the record of trial. He is the only one

connected with the trial lawfully in possession of the information. If it remains locked in his briefcase, or hidden among the papers on the counsel table, the record of trial is necessarily incomplete in one very vital aspect. See United States v. Kupfer, 3 USCMA 478, 13 CMR 34.

The majority conclude that the record of trial "bears testimony" that all personnel regarded the case as not capital. I do not find that testimony. On the contrary, the evidence on the subject strongly suggests that, with the possible exception of trial counsel, the trial personnel were not aware of the convening authority's direction. The order referring the case for trial, which accompanied the charges given to the court, expressly provides that it is "subject to no instructions." At no time during the entire proceedings did trial counsel ever make any statement or suggestion that the convening authority had ordered the case to be treated as not capital. The law officer, whose duties are perhaps most affected by a direction of this kind, certainly seems to have been unaware of the action taken by the convening authority. In instructing the court on the maximum sentence, he said: "Before closing the court, I would like to advise the court of the maximum punishment that it can impose as a result of its findings. The maximum punishment in this case is as the court may direct." It may properly be inferred from this instruction that the law officer regarded death as a permissible sentence. However, regardless of whether the evidence shows that the trial personnel were unaware of the order, such a showing is not the proper test. The record must show clearly and convincingly that the convening authority's direction was brought to the attention of the trial personnel. In the absence of such evidence, the record of trial is incomplete in a material respect.

The question still remains as to whether the accused consented to the admission of the several depositions touching upon the desertion offense. If he did, the depositions are admissible even in the absence of a direction to try the case as not capital. Manual,

supra, paragraph 145a. In United States v. Young, supra, it was held that a statement by defense counsel that he had no objection to the admission of a deposition, coupled with certain specific objections to particular interrogatories contained in the deposition, did not amount to the "express consent" required by the Manual. In the principal opinion in that case the court said (page 473):

> "Appellate Government counsel seek to defend the admission of depositions on the theory of consent because of the statement of defense counsel to the effect that they had no objection to their admission. When the first deposition was offered, the law officer asked trial counsel the reason for offering the evidence by deposition. The trial counsel answered that the witness had been rotated whereupon defense counsel stated that he had no objections to its admission. When the second deposition was introduced and read defense counsel objected to one interrogatory. His objection was sustained and that question and its answer were deleted. Thereafter the law officer asked if defense counsel had any other objections to make and the latter replied that he had none. Under certain circumstances this would be considered as a waiver but the wording of the Manual suggests an affirmative act showing positive relinquishment of the right to have the depositions excluded. It is not shown clearly that accused and his counsel were consciously aware of the inadmissibility of the evidence because he was charged with a capital offense. The depositions contained evidence which was not helpful to the accused and he could not gain any benefit from their introduction. On the other hand, an objection to their admission might have resulted in some advantage to him, as undoubtedly had the matter been called to the attention of the convening authority he would have ordered the case tried as a noncapital offense. In view of this it seems fair to assume that all parties participating in the trial failed to appreciate that the testimony given in the depositions was inadmissible because the offenses charged carried death sentences, and in the light of the negative rather than the positive approach taken by the parties, that the 'express consent' envisioned by the framers of the Manual was not present."

The situation here is substantially the same. Defense counsel said that he had no objection to the admission of the depositions and, in some instances, he objected to particular questions and answers; at no time did he clearly indicate he was aware of his right to object, but he nonetheless agreed to the admission. On the authority of the Young case, therefore, the admission of the depositions relating to the desertion charge was error.

Error alone does not require reversal. It is still necessary to appraise the effect of it on the substantial rights of the accused. If other competent evidence compels a finding of guilty, an error of this kind may be regarded as harmless. United States v. Young, supra. So we must inquire into the weight of other evidence indicating that the accused's absence was unauthorized.

Normally, the unauthorized nature of an absence is established by morning report entries. Five exhibits containing such entries were received in evidence, but their admissibility is seriously questioned. These exhibits are extracts from morning reports of the accused's permanent organization. They show the following:

| | From | To |
|---|---|---|
| (1) Dated June 16, 1952<br>ANDERTEN IRWIN W 5620A MAJ<br>deptd 0800 9 Jun 52 | asgd PP<br>tdy | asgd PP<br>AWOL |
| (2) Dated June 24, 1952<br>ANDERTEN IRWIN W 5620A MAJ<br>rtnd 1330 hours | asgd PP<br>AWOL | asgd PP arr<br>in qrs |
| (3) Dated July 7, 1952<br>ANDERTEN IRWIN W 5620A MAJ<br>deptd 0800 31 May 52 | asgd PP PFD | asgd PP AWOL |

ANDERTEN IRWIN W 5620A MAJ
rtnd 1655 21 Jun 52

(4) Dated August 25, 1952
ANDERTEN IRWIN W 5620A MAJ
awaiting trans to Okinawa
eff 1655 hrs 21 Jun 52

(5) Dated October 10, 1952
ANDERTEN IRWIN W 5620A MAJ
eff 0800 6 Jun 52

asgd PP arr
asgd AWOL PP in qrs
/s/ R. M. Priesmeyer MAJ USAF

asgd PP asgd PP abs
AWOL conf

/s/ Henry S. Taylor LT COL USAF

asgd PP asgd PP
tdy AWOL
/s/ Henry S. Taylor LT COL USAF

Judge Latimer finds these entries are inaccurate, but he holds that the inaccuracies do not make them inadmissible. I arrive at a different conclusion on the last three exhibits, and Judge Brosman agrees with me.

When properly authenticated, official records are competent proof of those facts required by law to be recorded. The Manual rule is as follows (paragraph 144*b*, page 265):

"An official statement in writing, whether in a regular series of records or a report, made as a record of a certain fact or event is admissible as evidence of the fact or event if made by an officer or other person in the performance of an official duty, imposed upon him by law, regulation, or custom, to record such fact or event and to know, or to ascertain through appropriate and trustworthy channels of information, the truth of the matter recorded."

Patently, two requirements must exist before a writing can be considered an official record: (1) the entry must be in the performance of an official duty, and (2) the fact recorded must be known or ascertained through appropriate and trustworthy channels of information. It may be presumed that a person having a duty to make the record performed that duty properly. Manual, supra, paragraph 144*b*, page 265. United States v. Wilson, 4 USCMA 3, 15 CMR 3. The evidence in this case not only rebuts the presumption, but irrefutably demonstrates that the last three entries were not properly made.

The accused was directed by letter orders to proceed from his unit on Okinawa to Headquarters, Far East Air Forces, in Japan, on temporary duty for approximately five days, for the purpose of obtaining civilian counsel. Upon completion of temporary duty, he was to return to his proper organization. Air Force provisions relating to personnel accounting provide that an individual placed on temporary duty, with a unit other than the one to which he is permanently assigned, must be accounted for on the morning reports of both organizations. Responsibility for noting a change in status is primarily imposed upon the commander of the attached unit, who, in turn, notifies the permanent unit.

"A person will be reported as attached when he is placed temporarily with the reporting unit for duty or for other administrative reasons and is assigned to another organization, except; personnel performing duty for the reporting unit but assigned to another unit at the *same* installation; personnel attached for rations and quarters only; and members of units or detachments which are attached solely for administration. Personnel on duty with a unit for the purpose of performing detached duty; patients in hospitals who are not assigned to the detachment of patients; and personnel who depart after the EDCSA or arrive prior to the EDCSA are typical examples of personnel who *will* be reported as attached. Remarks which reflect changes in basic or supplemental data, AWOL status, or which report separations of attached personnel, will be entered on the Morning Report prepared by the unit to which the person is attached and on the Morning Re-

port of the unit of assignment. Commanders having attached personnel under their jurisdiction will be responsible for forwarding prompt notification of such changes to the unit of assignment so that the changes may be reflected in the Morning Report prepared by the unit of assignment." [Personnel Accounting Manual, AFM 171–6, chapter 4, paragraph 2d(1)(a).]

The only morning reports in evidence were those from the accused's permanent organization. At the times in issue, Major Priesmeyer and Lieutenant Colonel Taylor, successively, were the commanding officers of that unit. Each testified unqualifiedly that he had never received any information regarding the accused's status from his assigned organization. Neither of them made any effort to obtain such information from Headquarters, Far East Air Forces, or from any source, other than the wing or base legal officer, Major Gillis. Each of the three entries were made only because requested by the legal officer. Thus, Major Priesmeyer stated that he could not reconcile his entry of July 7, 1952, "other than it was the advice of the Base Legal Officer." Colonel Taylor admitted that the entries of August 25 and October 10, which were certified by him as commanding officer, were made on the "sole basis" that they had been requested by the legal officer. In his own testimony, Major Gillis, the base legal officer, conceded that he did not communicate with Headquarters, Far East Air Forces, and he never received any report from them as to the accused's status. He "believed" that he may have received information from the staff judge advocate of the Twentieth Air Force, but the only check he made was with Military Air Transport Service. From that Service he learned only that there was no passenger backlog in plane travel from Tokyo to Okinawa.

The implications of this testimony are such that the entries might well be condemned as having been made "principally with a view to prosecution, or other disciplinary or legal action." Manual, supra, paragraph 144d, page 268. However, excluding that possibil-

ity, it cannot be said that, under the circumstances, the base legal officer was an "appropriate channel of information" from which to ascertain the accused's absence without leave status. The Air Force Manual sets out specific sources from which to obtain data on a change in status. AFM 171–6A, November 1, 1951, paragraph 5, page 2. The staff judge advocate is not included in this enumeration. But, considering the enumeration as nonexclusive, it is certain that the staff judge advocate is not generally charged with responsibility for the determination of an absence status. Under Air Force regulations, that is the responsibility of the commanding officer of the accused. Regulation 35–73, paragraphs 5, 9. And it does not appear that the commanding officers here sought only legal advice from the legal officer for the proper discharge of their own responsibilities in the preparation of the morning report entries. Cf. United States v. DeAngelis, 3 USCMA 298, 12 CMR 54. The inescapable conclusion is that the last three morning report entries were not based upon personal information, or upon information obtained from appropriate sources. Hence, they fail to satisfy the requirements of an official record.

Left for consideration are the entries of June 16 and June 24. Both of these were certified by Major Priesmeyer. He testified that the original absence without leave entry was made on an estimate of time allowed the accused for travel to and from his permanent base to Headquarters, Far East Air Forces, together with the time required for completion of this temporary duty. He said that before he made the actual entry he discussed the matter with the base adjutant to determine the base policy. It is significant, however, that he also admitted he discussed the entry with Major Gillis. From Major Gillis' testimony, it appears, at least inferentially, that he may have originated the idea. The testimony in this respect is not too clear. However, that is understandable. Both witnesses were called by the defense, but since the validity of their official acts was being questioned, they were essentially uncooperative witnesses. In fact, Major

Gillis was virtually hostile. It was on his recommendation that the accused was permitted to go on temporary duty. When the accused failed to return, he quite properly was exasperated. So much so that when "Major Anderten returned and had no explanation for his absence," he told the accused's commanding officer to change the morning report to show the date of the offense as May 31, instead of June 9. However, the point in issue is not the hostility of the witnesses, but rather the validity of the morning report entries of June 16 and 24.

Giving the presumption of regularity the fullest possible effect, it may be assumed that the June 16 entry meets the bare essentials of an official record. The June 24 entry seems not to have been the subject of any direct testimony, and consequently it would be entitled to the presumption of regularity. However, the weight to be accorded both entries is seriously affected by the entire course of conduct in their preparation. Of particular importance is the complete disregard of regular sources of information on the duty status of military personnel. Therefore, I believe that these entries, standing alone, are not so compelling as to require an affirmance of the conviction, regardless of the improperly admitted depositions. As a matter of fact, the board of review expressly recognized the insubstantial nature of these entries. In its opinion it said:

"It is probable that the court disregarded the morning reports, as did the Board, and relied upon the other evidence, including the testimony of the accused's commanding officer, in determining the date of inception of the unauthorized absence (See U. S. v. Strong [No. 244], 5 CMR 55, 65)."

In any event, the question is not whether the entries are alone sufficient to sustain the conviction, but whether the error in the admission of the depositions actually influenced the court in its final determination. I believe they did. Accordingly, I would reverse the findings of guilty on the absence without leave charge, and return the case to The Judge Advocate General of the Air Force for action not inconsistent with this opinion.