UNITED STATES, Appellee

v.

JOHN J. DeANGELIS, Captain, U. S. Air Force, Appellant

3 USCMA 298, 12 CMR 54

No. 999
Decided September 11, 1953

Earl J. Carroll, Esq., Dayton M. Harrington, Esq., LT COL Harry T. Dykman, USAF, and COL Kenneth B. Chase, USAF, for Appellant.

COL David D. Porter, USAF, COL Wendell C. Dreier, USAF, and CAPT Giles J. McCarthy, USAF, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

The accused, a captain in the United States Air Force, was convicted by general court-martial at Wiesbaden, Germany, and Rome, Italy, of fraudulently converting $79,837.67, property of the United States entrusted to him as Special Disbursing Agent of the Treasury Department of the United States, in violation of Article of War 96, 10 USC § 1568. He was sentenced to dismissal, total forfeitures, confinement at hard labor for seven years and a fine of $10,000, or further confinement until the fine is paid, but not exceeding two more years. The convening authority approved and the board of review affirmed the findings. The board, however, reduced the period of confinement to five years. We granted the accused's petition for review limited to consideration of three issues:

"1. Whether the accused was denied compulsory process for available material witnesses.

"2. Whether the Staff Judge Advocate was disqualified from reviewing the case because of alleged activities in the pre-trial investigation.

"3. Whether the total confinement adjudged and the imposition of a fine and total forfeitures are legal."

The offense charged was committed and trial was begun prior to the effective date of the Uniform Code of Military Justice, 50 USC §§ 551–736. Accordingly, the charge was properly alleged as a violation of the Articles of War, and the trial was governed by the provisions of the Manual for Courts-Martial, U. S. Army, 1949. The accused was represented throughout the proceedings by individual civilian counsel. In view of the questions presented, a brief summation of the facts will suffice.

The accused was assigned to duty with the American Battle Monuments Commission in Rome, Italy. As an incident of this assignment, he was designated as a disbursing officer by the Treasury Department of the United States to make disbursements in satisfaction of authorized obligations incurred by the Commission. He entered upon these duties on December 1, 1949, and continued until he was relieved on October 18, 1950. Pertinent Federal statutes and regulations of the General Accounting Office required him to file an account of receipts and disbursements, supported by appropriate vouchers, covering each monthly period. In his report for the period August 1, through August 31, 1950, the accused acknowledged an indebtedness to the United States in the sum of $79,102.28. An audit was thereafter made of his account and the shortage of $79,879.67 was established. When questioned by representatives of the Criminal Investigation Division, the accused confessed that from May 1950, through the period referred to in the specification of the charge, he used funds of the Commission to finance his bets at various Italian race tracks. When he realized that he had lost a considerable sum of money in this fashion he then used more of the funds in an attempt to "fix the races." However, he discovered that his confederates were duping him, rather than the racing public. Questioned about the complicity of a bookkeeper in these shortages, the accused absolved the bookkeeper completely, asserting that he alone was responsible for the shortages. He further alleged in this statement that one Mrs. Restucci was receiving a commission from the Lasa Company, a firm which had been granted a large contract to supply headstones to the Commission. When he

**300**

first learned of this, he discussed the matter with his superiors on the Commission, and was satisfied that they as well were involved in this illegality. Statements of the accused to the bookkeeper, made prior to the audit, also indicated the accused's guilt of embezzlement as alleged. At the trial, which extended for a period of thirty-four days, the accused elected to remain silent on the merits.

## II

The contention that the accused was denied compulsory process to obtain witnesses in his behalf is founded upon defense requests made at various stages of the trial for the presence of certain Italian nationals, all residents of Italy, and a group of American citizens, both military and civilian. A consideration of this contention requires a brief review of elementary principles.

The primary requisite of evidence, whether presented through the testimony of witnesses, or otherwise, is that it be both material and relevant. Paragraph 124, Manual for Courts-Martial, U. S. Army, 1949. In recognition of this fundamental requirement, paragraph 105a of the 1949 Manual, *supra*, provides:

"The trial judge advocate will take timely and appropriate action with a view to the attendance at the trial of the witnesses who are to testify in person. *He will not of his own motion take such action with respect to a witness for the prosecution unless satisfied that his testimony is material and necessary* and that a deposition will, for any reason, not properly answer the purpose, or will involve equal or greater inconvenience or expense. The trial judge advocate will take similar action with respect to all witnesses requested by the defense, except that *where there is reason to believe that the testimony of a witness so requested would be immaterial or unnecessary,* or that a deposition would fully answer the purpose and protect the rights of the parties, the matter will be referred for decision to the appointing authority or to the court, according to whether the ques-

tion arises before or after the trial commences. . . ."

Under these provisions, before the trial judge advocates subpoenaes a witness, he must be satisfied that the testimony of such a witness is material and necessary. In the case of witnesses requested by the defense, he must refer all requests for witnesses whose testimony he considers immaterial or unnecessary to the appointing authority or to the court for decision. These same considerations of materiality and necessity are the standards by which the decision of the convening authority or the court are to be determined. It is only after this determination has been made that the means of obtaining the witness' appearance or testimony by deposition, or otherwise, becomes important. Discussing a similar problem presented to the Supreme Court of Washington in State v. Graves, 13 Wash 485, 487, 43 P 376, 377, that court stated:

". . . it is clear that the defendant is only entitled to have necessary and material witnesses subpoenaed for him at the expense of the state or county, and he cannot be held to have the right to decide upon the materiality of the testimony that he expects from the witnesses desired. The decision of this question must rest with the court, and in such cases no subpoenaes should be issued in behalf of a defendant, to compel the attendance of witnesses, without an order of the court having been obtained. . . ."

In Jenkins v. State, 31 Fla 190, 193, 12 So 680, 681, the Supreme Court of Florida, reviewed the refusal of a trial judge to subpoena a witness for the defense whose testimony was found immaterial, and declared:

". . . While section 11 of our constitutional declaration of rights emphatically declares that 'in all criminal prosecutions the accused shall have compulsory process for the attendance of witnesses in his favor,' still we do not understand that there is anything in this general provision of the fundamental law that prohibits wholesome legislative regulation in

**301**

the matter of procuring the attendance of witnesses by parties charged with crime, when, as in this case, it is proposed to throw upon the state the burden of the cost and expense to be incurred therein. Neither do we understand that this constitutional provision was designed to give to parties charged with crime carte blanche right, at the cost of the state, to have any and all parties whom they may choose to represent to be witnesses in their favor summoned ad libitum without let or hindrance. To put such a construction on the organic law into actual practice would soon suffice to deplete the public treasury. . . ."

Rule 17, of the Federal Rules of Criminal Procedure, similarly requires a showing that the testimony of a witness requested by an indigent defendant is material and necessary. That Rule provides:

"(b) Indigent Defendants. The court or a judge thereof may order at any time that a subpoena be issued upon motion or request of an indigent defendant. The motion or request shall be supported by affidavit in which the defendant shall state the name and address of each witness and the testimony which he is expected by the defendant to give if subpoenaed, and *shall show that the evidence of the witness is material to the defense, that the defendant cannot safely go to trial without the witness.* . . ."

With the premise that the testimony of *any* witness requested by the defense must be shown to be both material and necessary, as a condition precedent to the issuance of process to compel his attendance firmly established, we consider first the accused's request for the attendance of the Italian nationals.

When the presence of the Italian witnesses was requested by the defense counsel, the law member required counsel to submit an offer of proof of their expected testimony. The following colloquy between the law member and the defense counsel then transpired:

"DC: I can't until I have talked to these witnesses. I haven't seen the witnesses.

"LM: How do you know whether they will be material or not?

"DC: I have been informed by the accused, one: they are material, as most of the witnesses are involved in the transactions which occurred in connection with this money . . . . All I have to show in this connection with the witnesses is not what they will testify to, Colonel, despite your idea, all I have to show is that as to a material event in this case this witness was present, that he should be able to testify as to what occurred. That is all I have to show. I don't have to sit here and guess what the witness is going to testify to at all. I am not asking you to bring witnesses from the United States now. I am not asking you to take a witness who is more than one hundred miles away and bring him here. That is what the Manual you are talking about pertains to. I am in the city of Rome and the witnesses are available. You can't bring them here because your boss didn't make the proper arrangements, and the man who appointed you, the appointing authority of this court, and this is a court of specific and limited jurisdiction, had no more authority to appoint you to sit in a community he couldn't make arrangements to subpoena witnesses than he would have to appoint the members of the Elks' Lodge in Timbuktu, to sit on it as court members. . . . I do not propose to chase witnesses at all. These witnesses are material witnesses. I am going to ask for a postponement of this case. . . . To prepare the defense's case, I am going to ask for a postponement of one week in which to prepare it. He has a large number of witnesses. I will interview the witnesses. I will get as many witnesses here as I can. The number that will come voluntarily I will produce. The ones who refuse to come, I will accept no such edict pronounced by you . . . . if you ever pronounce judgment on this accused without power to produce the wit-

nesses, you will, each and every one, be held civilly liable.

"LM: Your threats—just a minute —your threats don't in any way bother the court one bit. This court will act according to its discretion and conscience. I will say this for you, though. If you want a postponement for the purpose of interviewing a large number of witnesses and then come into court and tell the court what witnesses are material and give the reason why they are material to justify your acts today we will give you a postponement and the trial judge advocate will do everything he can to co-operate to get the witnesses you want."

This offer of the law member was then summarily rejected by the defense counsel, who, it should be noted, had requested a postponement. The grounds alleged by the defense were as follows:

"DC: . . . . Unless you get compulsory process, we can't do anything. We will not be prepared to go forward a week from today or ten years from today.

• • • • • • •

"DC: I am not prepared to, Colonel. I might as well tell you now. I do not want a postponement, I am not prepared."

Despite the defense request for the presence of one Dr. Sonaglia, when it was discovered that the witness had been present at the place of trial for several days to the knowledge of counsel, the following transpired:

"LM: Sonaglia was here the last few days. Why didn't you put him on the stand, Mr. Carroll?
"DC: Are you asking that question in sincerity, or trying to be funny?
"LM: I am asking it sincerely and I never try to be funny. You have had him three days. . .
"DC: You want to know why I didn't put him on the witness stand?
"LM: You keep asking for him continually.
"DC: Have you ever tried a case? That is the most absurd question I ever heard of. You want to know

why I didn't put him on the witness stand? Any first year law student would know that.

• • • • • • •

"DC: I haven't finished interviewing Sonaglia. . . ."

Considered apart from its aspects of contempt, the language of counsel conclusively demonstrates the transparency of his vulpine tactics, calculated to obscure facts rather than develop them— to create confusion, rather than establish a foundation for a considered ruling upon his motions and requests. We are convinced by these rapid changes of the accused's position that counsel was interested, not in obtaining the witnesses, but only in creating an artificial ground for appeal. Moreover, measured by the standards of *materiality* and *necessity* discussed above, we are equally certain that the substantial rights of the accused were in no way impaired. When counsel failed or refused to demonstrate by an offer of proof the materiality of the expected testimony of the requested witnesses, the law member would then have been justified in denying the defense request. However, with a commendable regard for the rights of the accused, the law member granted a continuance and directed the trial judge advocate to afford the defense all possible assistance in finding and interviewing the witnesses. We have examined the offers of proof and stipulations of testimony submitted after the postponement, and we are satisfied, as was the board of review, that none of the testimony expected from the requested witnesses, was material or necessary. Consequently, whether compulsory process to compel their presence was available or not, is quite beside the point.

The situation presented by the requests for the American witnesses is free from error. Each witness was shown to be over one hundred miles from the place of trial. Consequently, if the accused *in fact* desired their presence as witnesses, his failure to establish the materiality of their testimony, to submit a request for obtaining their testimony by deposition, or to show that

**303**

depositions would not answer the purpose, precludes any claim of error at this stage of the case. We conclude, therefore, that the accused was not denied compulsory process for available material witnesses. This does not completely dispose of the problems presented by this phase of the case, however. Of paramount importance is the conduct of the defense counsel reflected in his manner of addressing the court.

The remarks of counsel, as quoted above, adequately reflect the course of his conduct throughout the ■ trial. A detailed recital of other instances of his grossly insulting, provocative language is unnecessary. Although the problems presented by the petition have no reference to the conduct of defense counsel, we cannot ignore such deliberately contemptuous tirades, nor permit a course of conduct designed solely to delay and hinder the completion of trial to pass unnoticed. Our review of the record of trial, consisting of approximately two thousand pages, impels the conclusion that the obstructive and abusive actions of counsel flouted the authority of the law member, made a mockery of the requirement of decorous behaviour, and impeded the expeditious, orderly, and dispassionate conduct of the trial. Although counsel unquestionably has a right to press his arguments vigorously, and explore freely all avenues favorable to his client, there is a limit beyond which he may not go without incurring punitive action. In instances of such flagrantly contemptuous conduct, law officers should not hesitate to employ the power granted by Article 48, Uniform Code of Military Justice, 50 USC § 623, especially when counsel has been warned against such action. In Sacher et al v. United States, 343 US 1, 96 L ed 717, 72 S Ct 451, decided March 10, 1952, Mr. Justice Jackson, speaking for the Supreme Court, set forth principles which law officers may well use as a guide when faced with such conduct, when he declared:

"Summary punishment always, and rightly, is regarded with disfavor and, if imposed in passion or pettiness, brings discredit to a court as certainly as the conduct it penalizes.

But the very practical reasons which have led every system of law to vest a contempt power in one who presides over judicial proceedings also are the reasons which account for it being made summary. Our criminal processes are adversary in nature and rely upon the self-interest of the litigants and counsel for full and adequate development of their respective cases. The nature of the proceedings presupposes, or at least stimulates, zeal in the opposing lawyers. But their strife can pervert as well as aid the judicial process unless it is supervised and controlled by a neutral judge representing the overriding social interest in impartial justice and with power to curb both adversaries. The rights and immunities of accused persons would be exposed to serious and obvious abuse if the trial bench did not possess and frequently exert power to curb prejudicial and excessive zeal of prosecutors. The interests of society in the preservation of courtroom control by the judges are no more to be frustrated through unchecked improprieties by defenders.

"Of course, it is the right of counsel for every litigant to press his claim, even if it appears farfetched and untenable, to obtain the court's considered ruling. Full enjoyment of that right, with due allowance for the heat of controversy, will be protected by appellate courts when infringed by trial courts. But if the ruling is adverse, it is not counsel's right to resist it or to insult the judge—his right is only respectfully to preserve his point for appeal. During a trial, lawyers must speak, each in his own time and within his allowed time, and with relevance and moderation . . . ."

### III

The accused next contends that the actions of the Air Judge Advocate on the staff of the convening ■ authority, made him an investigating officer, disqualifying him from reviewing the record of trial. Consequently, his participation in the review prejudiced the accused.

The merit, or lack thereof, of this

contention cannot be determined without an understanding of the circumstances of the case. When it was clearly indicated that a huge sum of Government money had been embezzled, and that the accused had sought to use his official position in Italy to acquire sufficient funds from an Italian firm to cover his defalcation, the convening authority directed several members of his command to Rome, where the offense had been committed. Among these officers was the Air Judge Advocate. The other officers interviewed witnesses, obtained statements, and prepared a report of their investigation after consulting with the Judge Advocate, from whom, from time to time, they obtained advice. Article of War 47, 10 USC § 1518 provides:

"(b) *Reference for trial.*—Before directing the trial of any charge by general court-martial the convening authority will refer it to his staff judge advocate for consideration and advice; and no charge will be referred to a general court-martial for trial unless it has been found that a thorough and impartial investigation thereof has been made as prescribed in the preceding article, that such charge is legally sufficient to allege an offense under these articles, and is sustained by evidence indicated in the report of investigation."

Since a staff judge advocate is the administrator of military justice and discipline, it would be incongruous in the extreme were we to assume that he is unable to function at all unless and until charges have been preferred and investigated. Because of his position and the knowledge of law he possesses, all members of the armed forces consult him when violations of the Articles of War, or the Uniform Code of Military Justice occur. Especially is this true when a crime of unusual magnitude or one involving serious implications is under investigation. It is obvious that the use of his services minimizes the risk of error arising from faulty pretrial investigations, and appreciably reduces the preference of ill-founded charges against those subject to military law. Nor must a staff judge advocate sit idly by when he perceives a deficiency in the pretrial report of investigation. Whenever a report of investigation fails to disclose an essential element of the offense charged, the staff judge advocate must direct the attention of the investigating officer to the deficiency. If there is, in fact, no evidence of that element available, a proper reason for dismissing the charge arises. If it is available, it should be obtained and made a part of the report.

We believe that convening authorities generally are aware of these functions of a staff judge advocate. Certainly the convening authority in this instance was, for it is clear beyond peradventure that the Air Judge Advocate was sent to Rome to be available to the investigators for consultation and advice. His services were as necessary to the accused, as to the Government, and in no way disqualified him in performing his impartial task of reviewing the record of trial. Accordingly, we find no merit in this contention.

IV

Although the accused was charged with embezzlement under Article of War 96, *supra,* the board of review correctly construed the charge as larceny in violation of Article of War 93, 10 USC § 1565. As such, the maximum period of confinement imposable under the Table of Maximum Punishments, Section A, paragraph 117c, Manual for Courts-Martial, U. S. Army, 1949, was five years. Accordingly, the confinement adjudged was reduced to five years. The accused now contends that this period of confinement exhausted the punitive jurisdiction of the court-martial and the additional sentence "to pay the United States a fine of ten thousand dollars and to be further confined at hard labor until said fine is so paid, but not more than two years" is void.

Section B, paragraph 117c, Manual for Courts-Martial, U. S. Army, 1949, lists a fine as a permissible additional punishment, except against enlisted persons, when unjust enrichment is shown. In the case of enlisted personnel a fine may be imposed only *in lieu*

of a forfeiture. No such limitation exists in the case of an officer. There is, therefore, no doubt about the court's power to impose a fine under the circumstances of this case. The sole question is, whether the additional confinement provided in the event the accused fails to pay the imposed fine is excessive.

The mere recitation of a fine as a "Permissible Additional Punishment" is ample answer to this question. This fine was imposed as an additional punishment, and is governed only by the discretion of the court-martial and the board of review. The provision for further confinement was not made as punishment for the offense, but merely as a means of coercing the collection of the fine imposed. While the accused may suffer further imprisonment as a result of this provision, it must be remembered that "he carries the keys of his prison in his own pocket." In Re Nevitt, 117 F 448, 461. See also, Re Jackson, 96 US 727, 24 L ed 877.

The provision that the accused be further confined until the fine is paid, after imposition of the maximum period of confinement, was a proper exercise of the court-martial's punitive authority, and is legal.

The decision of the board of review is affirmed.

Judges LATIMER and BROSMAN concur.