UNITED STATES, Appellee,

v.

Scott E. BURNETT, Private First Class,
U.S. Army, Appellant.

No. 52,544.

CM 444568.

U.S. Court of Military Appeals.

Sept. 30, 1988.

For Appellant: *Captain Richard J. Anderson* (argued); *Colonel Brooks B. LaGrua, Lieutenant Colonel Arthur L. Hunt, Major Eric T. Franzen* (on brief); *Captain Donna Chapin Maizel* and *Captain Brian D. Digiacomo.*

For Appellee: *Captain George R. Gillette* (argued); *Colonel James Kucera, Lieutenant Colonel Adrian J. Gravelle, Major Byron J. Braun* (on brief); *Colonel Norman G. Cooper, Captain John F. Burnette, Captain Alan L. Overton.*

*Opinion of the Court*

EVERETT, Chief Judge:

Appellant was tried at Wuerzburg, Federal Republic of Germany, by a general court-martial composed of officer members and, pursuant to his pleas, was found guilty of one specification of conspiracy to rob, two specifications of robbery, and two specifications of kidnapping, in violation of Articles 81, 122, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 881, 922, and 934, respectively.[1] He was sentenced to a dishonorable discharge, confinement for 4 years, total forfeitures, and reduction to E–1. The convening authority reduced the confinement by 9 months but otherwise approved the sentence. The Court of Military Review affirmed in a short-form opinion. Thereafter, this Court granted appellant's petition for review to consider these issues:[2]

I

WHETHER THE MILITARY JUDGE PROPERLY DEFINED "CONTEMPT" IN HIS INSTRUCTIONS TO THE COURT MEMBERS.

II

WHETHER THE CONDUCT OF THE CIVILIAN DEFENSE COUNSEL CONSTITUTED "CONTEMPT" IN TERMS OF ARTICLE 48, UNIFORM CODE OF MILITARY JUSTICE AND PARAGRAPH 118, MANUAL FOR COURTS–MARTIAL, UNITED STATES, 1969 (REVISED EDITION).

III

WHETHER A MILITARY JUDGE SITTING IN A COURT DERIVING ITS POWER FROM ARTICLE I OF THE CONSTITUTION HAS THE SAME INHERENT POWER TO SUMMARILY PUNISH CONTEMPTS AS DOES A FEDERAL DISTRICT JUDGE (*SEE IN RE TERRY*, 128 U.S. 289, 9 S.Ct. 77, 32 L.Ed. 405 (1888)).

IV

WHETHER THE MILITARY JUDGE ERRED TO APPELLANT'S SUBSTANTIAL PREJUDICE BY NOT GRANTING THE DEFENSE MOTION TO ALLOW INDIVIDUAL DEFENSE COUNSEL TO WITHDRAW FROM REPRESENTING APPELLANT BEFORE THE MEMBERS AFTER THE MEMBERS HAD FOUND INDIVIDUAL DEFENSE COUNSEL IN CONTEMPT OF COURT AND HAD PUNISHED HIM.

I

From early in the trial the relations between the military judge and the civilian defense counsel had been less than harmonious.[3] The judge had halted defense counsel's effort to clarify some of Burnett's answers during the providence inquiry. Then he objected when defense counsel sought to advise appellant during this inquiry. Later defense counsel rejected the

---

1. On defense motion, a charge and two specifications alleging assault were dismissed because the assaults were the means for carrying out the robberies.

2. The first three issues were specified by the Court, and the fourth issue was assigned by appellate defense counsel.

3. At the outset, the appointed military defense counsel had been excused with Burnett's consent.

military judge's suggestion that the defense present its mitigation evidence before the Government's aggravation evidence, in order to avoid a trial delay.[4]

The military judge refused to let defense counsel make an opening statement during the sentencing proceedings. Subsequently, defense counsel moved for a mistrial twice on the grounds that, by his questioning of government witnesses, the judge had assumed the role of a prosecutor. Also, the military judge overruled a defense objection to the testimony of a government witness who, defense counsel claimed, had been signaling to other witnesses and harassing appellant.[5]

When the defense commenced with its evidence in mitigation and extenuation, the individual defense counsel, Mr. Joel Cohen, called Private First Class June Stewart as a witness. Stewart, who had been appellant's accomplice, described events that had led up to the crimes; and her testimony tended to show that, in some respects, Burnett's motives for the crimes had been good.

During cross-examination, this exchange took place between PFC Stewart and trial counsel:

Q: Okay, when did you stop believing that what you were doing was in the perimeter of the law?

A: Sir, like I say, after all that happened, I didn't think anything of it until he disappeared and really he started acting funny with everybody first, and I don't know, I'm not really sure, but from what I understand he was supposed to let ... [appellant] know where he was going, and he said that he had told him that he was leaving [a] power of attorney to some students in Nurnberg, and [a] power of attorney to his car to ... [appellant].

Q: Let's go back to 5 September, that night—

DC: Objection, Your Honor, the witness has not finished responding to the question, which is when did she stop believing that John Downing was telling the truth.

MJ: I will allow the trial counsel to rephrase his question.

DC: Your Honor, the defense would request that the witness be permitted to respond to the question without interruption.

MJ: I have made my ruling, rephrase the question.

Cross-examination then continued uneventfully. During redirect this colloquy occurred:

Q: Okay, now, Captain Cabell [TC] asked you before when you stopped believing John Downing was telling the truth, and he and the military judge would not let you finish your answer—

MJ: Don't get smart, Mister Cohen; you do that one more time and I think that I will have the court show cause for contempt.

DC: Your Honor, I believe that she was prohibited from responding.

MJ: I don't care what you believe, Mister Cohen; it is disrespect to the court.

DC: Yes, Your Honor. May I ask the question to the witness and may the witness be permitted to respond to the question?

MJ: Not that question.

DC: I will not be permitted to have the witness respond to that question?

MJ: No.

DC: Thank you, Your Honor.

MJ: We will have a 39a session. Would you please go out, Mister President, and the rest of the court members.

\* \* \* \* \* \*

MJ: This out of court hearing is called to order. Recorder, will you please play

4. Consequently, a one-hour recess was necessary. The case was being tried in the evening—apparently because of various scheduling problems—and did not end until shortly after midnight.

5. When asked by the judge why he had not brought the witness' conduct to the judge's attention, defense counsel replied, "I thought it wouldn't make any difference the way things are going now."

back Mister Cohen's last question to the witness, and give it to me aloud, please?

(The reporter did as directed.)

MJ: Would you please explain to me what you meant about the phrasing on your last question? I am talking about the phrasing that you were prevented by the trial counsel and the military judge from hearing an answer to a question.

DC: Yes, Your Honor. That was the question which the military judge and the trial counsel prevented the witness from responding to. My understanding of the rules of evidence is that when a question is put to a witness and the witness responds, that witness ought to be given an opportunity to respond completely and fully, and ought not to be cut off by the trial counsel or the military judge.

MJ: What gives you the right to do that in front of the jury?

DC: Your Honor, it was an effort to draw the witness' attention to a question which she had not been permitted to respond, she had not been permitted to respond to that question by the military judge and by the trial counsel, and that was the reason that it was phrased in that way, in order to direct your attention to that particular area that she was trying to explain, trying to respond to, but had been prevented by the military judge and by the trial counsel from so doing. I would add to the military judge that I was not trying to be smart to the military judge, and that it is the position of the defense that that comment from the military judge, even if he believed that were the situation, was uncalled for in front of the jury and has deprived the accused, in addition to all the other matters that were raised before, of his right to a fair and impartial sentencing hearing. It is the position of the defense that the military judge had become involved in this case as a prosecutor.

MJ: Mister Cohen, whether I have or have not, what gives you the right to bring that to the court's attention the way you did?

DC: Your Honor—

MJ: I can't see that there is any justification for that, and at this time I will call the court members back and let them make a determination as to whether or not they believe you should be held in contempt of this court....

DC: Your Honor, I would request that another judge be appointed for such a hearing, that if an allegation of that type is to be made by the military judge, it would have to be done on a record. The court is not aware of any matters that have taken place in out of court sessions, they are not aware of the military judge's continued attempts on behalf of the prosecution, nor the rulings by the military judge and I would add that—

MJ: Again, Mister Cohen, we are outside the presence of the court and I am finding your comments bordering on contempt, if you wish to proceed in this matter, we can have two hearings.

DC: Very well, Your Honor.

MJ: Call the members, please.

The members returned; the trial was suspended; and the following contempt proceeding was conducted:

TC: Mister Joe Cohen, you appear to have used disruptive words, and disturbed these proceedings by disorderly conduct. For example, you have been contemptuous and insolent in your comments, and in your questioning of witnesses. In this regard, Article 48 of the Uniform Code of Military Justice provides that any person who uses any menacing words in the presence of a court-martial or who disturbs its proceedings by disorder may be punished for contempt. I will now give you an opportunity before the court to show cause why you should not be held in contempt.

DC: Your Honor, I am not aware of any words or phrases in which I have dis-

rupted the Court, nor in which I was contemptuous, and therefore Your Honor, I can't respond to it.

MJ: Subject to objection by any member of the court, it is my ruling that you should be held in contempt. Does any member of the court object to my ruling? Is there an objection? I take it none.

PRES: There is no objection.

MJ: Now, you are advised that you must now close to determine fully by secret written ballot, whether Mister Joe Cohen should be held in contempt. Again, Article 48 of the Uniform Code of Military Justice provides that any person who uses any menacing words, or conducts himself with disorder before the court, in the presence of a court-martial, and who disturb [sic] its proceedings by disorder may be punished for contempt.

\* \* \* \* \* \*

After the judge had explained the voting procedure and before court was closed, the president of the court-martial asked "about what exactly constitutes contempt." The military judge responded, *"Any disorder or disrespect* to the court committed in the presence of the court." (Emphasis added.) The members of the court-martial subsequently found Mr. Cohen guilty of contempt.

While the members were deliberating on the punishment for the contempt, Mr. Cohen requested an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session; and when this session was convened, he stated:

DC: Your Honor, at this time the defense would request permission from the military judge to withdraw from this [sic] proceedings. It is the view of the defense counsel, based on the events that have taken place throughout the course of this proceeding, and the events that have just taken place, it would be impossible for me to effectively represent my client. That based upon what has occurred here there is no way that this court could render any credence to any argument that I make to them on behalf on [sic] my client, that there is no way that my continued representation of Scott Burnett would be anything other than counterproductive to him. Unless the military judge will grant a motion for a mistrial so that this counsel could appear before an untainted jury on behalf of this accused, it is my belief that based upon the entire record, particularly the events that just occurred, that the accused, PFC Burnett, will not before this panel, be able to receive a fair and impartial hearing on the sentencing matters. Certainly if this were a situation in which the military judge had called an Article 39a session to discuss the matters outside the presence of the court, it might have prevented the matters from tainting the proceedings with respect to the accused. I feel, however, that the accused has either the choice now of loosing [sic] the counsel of his choice or loosing [sic] the effective assistance of counsel if he chooses to proceed with the counsel of his choice.

The military judge declined to order a mistrial and denied Mr. Cohen's request to withdraw. He stated that he would advise the members that the contempt proceeding was totally unrelated to obtaining an appropriate sentence for appellant.

Subsequently, the court members returned to announce that they had sentenced Mr. Cohen to pay a fine of $100.00 and receive a reprimand. The judge then instructed the members that they should not let the contempt proceeding affect their decision as to an appropriate sentence; and the court members assured the judge that they would comply with this instruction.

II

Article 48 of the Uniform Code, 10 U.S.C. § 848, provides:

A court-martial, provost court, or military commission may punish for contempt any person who uses any menacing word, sign, or gesture in its presence, or who disturbs its proceedings by any

riot or disorder. The punishment may not exceed confinement for 30 days or a fine of $100, or both.

This language, which has not been changed since the Code was enacted, corresponds to that of Article of War 32.[6]

The language of Article 48 differs from that of 18 USC § 401, which provides:[7]

A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

(2) Misbehavior of any of its officers in their official transactions;

(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

▉ During the legislative hearings on the Uniform Code, there was a comment that Article 48 provided for "substantially the same rule that" existed "in the Federal criminal courts." Hearings on H.R. 2498 Before a Subcomm. of the House Armed Service Comm., 81st Cong., 1st Sess. 1060 (1949). Moreover, the Government now argues that a court-martial has inherent power to protect its proceedings against disrup-

tion and that this inherent power supplements authority conferred by the language of Article 48.

We are reluctant to accept this argument. A court-martial is convened on an *ad hoc* basis, and its inherent authority is more questionable than that of a tribunal existing on a permanent basis. Secondly, even if a court-martial might otherwise have authority to punish for contempt, we believe Congress may limit this authority. In this connection, we attach some significance to the circumstance that, in drafting Article 48, Congress did not use the broader language that had been employed in the corresponding section of the Federal Criminal Code. Moreover, since under Article 48 military jurisdiction is extended to "any person"—not merely to servicemembers—the statutory language should not be expanded by this Court.[8]

Finally, it appears to us that the broad construction of the contempt power for which the Government argues would be at odds with the history of Article 48 and its predecessors. When Colonel Winthrop wrote about "contempts" under the Articles of War, he stated:

[T]he employment of the single descriptive term "menacing" having the effect

---

**6.** Earlier, this language had been derived from Article 86 of the American Articles of War of 1874, which had been drawn from Article 54 of the Code of James II. *See* W. Winthrop, *Military Law and Precedents* 301 (2d ed. 1920 Reprint); Ochstein, "Contempt of Court," 16 JAG Journal 25, 27 (1962). Article 42 of the Articles for the Government of the Navy was broader in coverage; but under Naval law summary punishment of a civilian witness for contempt was not authorized. § 294, Naval Courts and Boards, 1937; Ochstein, *supra* at 27.

**7.** 18 U.S.C. § 401 contained the same language when the Uniform Code was enacted.

**8.** No constitutional issue has been raised here as to the power of a court-martial to punish civilians for contempt. *Cf. Kinsella v. United States ex rel. Singleton,* 361 U.S. 234, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960); *Reid v. Covert,* 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957). However, we have no doubt about its constitutionality. As Justice Jackson observed, there are "very practical reasons which have led every system of law to vest a contempt power in one who

presides over judicial proceedings." *See Sacher v. United States,* 343 U.S. 1, 8, 72 S.Ct. 451, 454–55, 96 L.Ed. 717 (1952), quoted in *United States v. DeAngelis,* 3 U.S.C.M.A. 298, 304, 12 C.M.R. 54, 60 (1953). Undoubtedly, the Founding Fathers, who obviously contemplated use of courts-martial, *see* U.S. Const., art. I, § 8, cl. 14, and amend. V, did not intend that such tribunals would lack the power to function effectively; but if they had no contempt power, courts-martial could be impeded where civilian witnesses or civilian counsel were involved. Furthermore, exercising the contempt power for contempts committed in the presence of the court has always been treated as an exception to some of the constitutional safeguards—such as jury trial—that would apply to other situations where punishment was being imposed. Indeed, the contempt power of a court-martial has received statutory recognition since the British Articles of War that predated the American Revolution and from which the American Articles of War were derived; and apparently this power has always been recognized in American military law. Finally, the punishment imposable under Article 48 is rather limited.

of excluding from the cognizance of the court, under the Article, the use, in its presence, of improper words, & c., which yet do not express or involve a threat or defiance. Thus language, however disrespectful, if it be not of a minacious character, cannot, unless actually amounting to or creating a *disorder*, in the sense of the further provision of the Article, be made the occasion of summary proceedings and punishment as for a contempt—a defect certainly in the statute.

W. Winthrop, *Military Law and Precedents* 307 (2d ed. 1920 Reprint) (footnotes omitted). He goes on to say:

The term "disorder" is still more general [than "riot"], and, in a broad sense, (analogous to that in which it is employed in Art. 62,) would mean, literally, any conduct in breach of the *order* of the proceedings. But, in the connection in which it here occurs, it is construed as implying more than a mere irregularity, and as importing disorder so rude and pronounced as to amount to a positive intrusion upon and interruption of the proceedings of the court. The more familiar examples of such a disorder and disturbance as are held to be contemplated by the Article are—assaults committed upon members, or upon persons connected with the court or properly before it; altercations between counsel or spectators; drunken or indecent conduct; loud and continued conversation; any noise or confusion which prevents the court from hearing the testimony, & c.; any shouting, cheering, or other expression of applause or disapprobation, especially if repeated after being checked; contumelious or otherwise disrespectful language, addressed to the court or a member or the judge advocate, of so intemperate a character as to derange the proceedings, especially if persisted in after a warning from the court.

Winthrop, *supra* at 308–09 (footnotes omitted).

9. Of course, we need not consider at this time whether, under the All Writs Act, 28 USC

Heretofore, this Court may have interpreted the language of Article 48 in a more sweeping way than Winthrop had in mind. *Cf. United States v. Cole*, 12 U.S.C.M.A. 430, 434, 31 C.M.R. 16, 20 (1961); *United States v. DeAngelis*, 3 U.S.C.M.A. 298, 304, 12 C.M.R. 54, 60 (1953). We do not retreat from these interpretations. Certainly, Congress never contemplated that the attorney's conduct involved in *DeAngelis* —which displayed flagrant rudeness to the law member in open court—would fall outside the purview of Article 48. However, just as Congress never intended that every "irregular or improper act on the part of a member of the military service" would be punishable as a disorder under Article 134, *cf.* para. 213 *a*, Manual for Courts-Martial, United States, 1951, undoubtedly it also did not contemplate that every heated exchange between a lawyer and a military judge would be punishable as a "contempt" under Article 48.

The propriety of the contempt proceeding against Mr. Cohen is significant to this appeal only insofar as it impinged on Burnett's right to receive a fair trial and to have the effective assistance of his counsel. Indeed, because only limited punishments can be imposed under Article 48 and because the Manual for Courts-Martial, United States, 1969 (Revised edition) provides expressly only for approval of contempt proceedings by the convening authority (para. 118*b* ), this Court has no occasion for direct review of contempt proceedings under Article 67 of the Code, 10 U.S.C. § 867.[9] However, we may properly review the possible impact on appellant's rights of the contempt proceeding against his attorney—which was conducted during the trial.

With this in mind we have examined the record closely; and, in view of the phraseology of Article 48 of the Uniform Code, we doubt that Mr. Cohen's conduct was punishable—especially in the absence of a more specific warning by the judge prior to the events which gave rise to the contempt proceeding. Furthermore, when

§ 1651(a), this Court might have authority for direct review of a contempt proceeding.

the military judge responded to the question from the president of the court-martial "about what exactly constitutes contempt," his reply—that it included "[a]ny disorder or disrespect to the court committed in the presence of the court"—allowed the court members to exceed the boundaries of the contempt power prescribed by Article 48. We conclude, therefore, that the finding that appellant's civilian defense counsel was guilty of contempt is tainted by error.

### III

■ As first enacted, the Uniform Code of Military Justice made no provision for "law officers" in special courts-martial; and, even in general courts-martial, the Code did not allow a law officer to conduct proceedings in the absence of the members. The contempt procedure provided by the 1951 Manual for Courts-Martial was consistent with the codal provisions. It contemplated that the members of a court-martial would determine, by secret written ballot, whether the alleged contemnor should be held in contempt and, if so, what should be the appropriate punishment. *See* para. 118*b*.

The Military Justice Act, Pub.L.No. 90–632, 82 Stat. 1335, 1338 (1968), amended the Code to replace the "law officer" with the military judge; authorize military judges for special courts-martial; allow trial by military judge alone, pursuant to the accused's request; and provide in Article 39(a) that the judge could hold sessions "without the presence of the members." Taking account of these changes in the Code, the 1969 Manual for Courts-Martial provided that, "[w]hen the military judge is trying the case alone, he will determine whether a person shall be held in contempt, and if he so determines, he will proceed to determine an appropriate punishment within the limits authorized by Article 48 and chapter XXV [Punishments]." Para. 118*b*.

For trials with members, however, the procedure employed in the 1951 Manual was retained. *See* para. 118*b*, 1969 Manual, *supra*. The Manual for Courts-Martial, United States, 1984, also leaves un-

changed how contempt proceedings are to be conducted in trials with court members. *See* R.C.M. 809. Accordingly, when trials take place before a general or special court-martial with members, the members ultimately decide whether a contempt has been committed. Moreover, just as in appellant's case, the trial is suspended until the contempt proceeding is completed.

Under this procedure, when the alleged contempt is by a defense counsel, a danger of prejudice to the accused is created. The Supreme Court adverted to this danger in *Sacher v. United States*, 343 U.S. 1, 72 S.Ct. 451, 96 L.Ed. 717 (1952), where the Court considered the propriety of the judge's delay until the end of the trial before he imposed punishment on several defendants and a defense attorney for a number of alleged contempts that had been committed during a lengthy and turbulent trial.

The contemners argued that the judge's power to punish them had to be exercised at the time of the contempt—as had been done in cases like *In re Terry*, 128 U.S. 289, 95 S.Ct. 77, 32 L.Ed. 405 (1888)—and that the judge could not accumulate a number of contempts for disposition at the end of the trial. The rationale for this contention was that the contempt power may be exercised by the presiding judge only in an emergency and only in order to maintain order and carry on the court proceedings but that, after a trial has ended, no emergency exists, so the contempt proceeding should be conducted by a different judge and be subject to a right of jury trial.

In rejecting this contention and upholding the action of the district judge, the Supreme Court pointed out:

> *To summon a lawyer before the bench and pronounce him guilty of contempt is not unlikely to prejudice his client.* It might be done out of the presence of the jury, but we have held that a contempt judgment must be public. Only the naive and inexperienced would assume that news of such action will not reach the jurors. *If the court were required also then to pronounce sen-*

*tence, ... it would add to the prejudice.* It might also have the additional consequence of depriving defendant of his counsel unless execution of prison sentence were suspended or stayed as speedily as it had been imposed. The procedure on which petitioners now insist is just the procedure most likely to achieve the only discernible purpose of the contemptuous conduct. Had the trial judge here pursued that course, they could have made a formidable assertion that it was unfair to them or to their clients *and that a new trial was required on account of it.*

343 U.S. at 10, 72 S.Ct. at 455–56, 96 L.Ed. at 724 (emphasis added; footnote omitted).

If, as the Supreme Court has suggested, a substantial risk of prejudice to the defendant is created when jurors are even aware that a defense attorney has been cited by the judge for contempt, the danger of prejudice would seem to be enhanced when the "jurors" themselves must determine during the trial whether a contempt has been committed by the attorney and what his punishment should be. Moreover, a defense counsel may have difficulty in zealously advocating his client's cause before the same persons who have just found the lawyer guilty of contempt and imposed a punishment therefor.

If there were no other way to handle the situation—as was true prior to the Military Justice Act of 1968—there might be some reason to apply the "Rule of Necessity," to which the Supreme Court has adverted in a different context. *See United States v. Will,* 449 U.S. 200, 213–16, 101 S.Ct. 471, 480–81, 66 L.Ed.2d 392, 405–06 (1980). However, a procedure that might be legally sustainable if there were no alternative may be vulnerable to attack if there are several reasonable alternatives to this procedure.

In our view, the changes in the Code made by the Military Justice Act of 1968 have turned the Manual's contempt procedure—as now prescribed in R.C.M. 809(c)—

into an anachronism. Unlike the situation in 1951, special or general courts-martial now are presided over by military judges, rather than by law officers; and these judges may conduct hearings outside the presence of the members. Thus, there is no statutory impediment to providing that in *all* cases the military judge will be responsible for conducting contempt proceedings, which will take place outside the presence of the court members. Moreover, as *Sacher* makes clear, there is no constitutional impediment to entrusting this authority to the military judge.

The Manual contemplates that the trial shall be suspended while the contempt proceedings take place. According to *Sacher,* there also is no constitutional prohibition against the judge's delaying contempt proceedings until the end of the trial; and there are some very practical reasons for such delay. In view of the authority provided to the military judge—who was intended by Congress to have powers akin to those of a Federal trial judge, *cf. United States v. Brickey,* 16 M.J. 258 (C.M.A. 1983); *United States v. Griffith,* 27 M.J. 42 (C.M.A.1988)—we are sure that a military judge may delay the contempt proceedings until the end of a trial if he chooses to do so.

IV

■ The procedure employed by the military judge was in accord with the provisions of the Manual for Courts-Martial. However, those provisions have themselves been made obsolete by the Military Justice Act of 1968.[10] We see no reason why Burnett should suffer prejudice from employment of an out-dated procedure and from the judge's failure to declare a mistrial after Mr. Cohen had been found guilty of contempt by the court members.

In light of the danger of prejudice recognized by the Supreme Court in *Sacher,* we conclude that the Court of Military Review should determine whether appellant was

---

**10.** Hopefully, the Executive Branch will devote some consideration to amending the Manual provisions to eliminate the anachronism. Furthermore, in light of the divergence between Article 48 and 18 USC § 401, Congress might wish to reexamine this Article.

prejudiced and, if so, what remedy is appropriate.

## V

The decision of the United States Army Court of Military Review as to sentence is set aside; the record of trial is returned to the Judge Advocate General of the Army for remand to that court for further review of the sentence.

Judge SULLIVAN concurs.

COX, Judge (dissenting):

I respectfully dissent. One of the most difficult jobs for any military judge is to deal with a sarcastic, "catty," insulting, disrespectful civilian attorney who most likely knows that any venom spewed out into the courtroom will probably be rendered non-poisonous by the written repetition of the seemingly innocuous language in the cold, emotionless record of trial. The court members who found Mr. Joel Cohen guilty of contempt were there; they heard him speak; they saw him speak; they observed his demeanor; and they certainly were able to understand the tenor and tone of his language. In my judgment, we have no business even gratuitously commenting on the findings of contempt, albeit in dicta.[1]

A "disorder" may mean many things, depending upon the context in which it is used. But without question it means contrary to order. W. Burton, *Legal Thesaurus* 177 (1980) lists 30 synonyms for the noun, disorder (lack of order), ranging from anarchism to uproar. For the adverb, disorderly, Burton lists 126 synonyms. Without really trying to find one synonym

which most closely describes Mr. Cohen's conduct, I find these that follow to be, at the very least, relevant:

> aberrant, aggressive, careless, defiant, disagreeable, ill-mannered, immoderate, impolite, insolent, mannerless, out of order, quarrelsome, ungentlemanlike, unmannerly, unseemly, [and amazingly the following,] uncourtly, [which Webster defines as "not suitable for a court"]

Merriam-Webster, *Webster's Third New International Dictionary of the English Language Unabridged* (1981).

I am satisfied that Mr. Cohen "disturb[ed] its proceedings by [a] ... disorder." Art. 48, Uniform Code of Military Justice, 10 U.S.C. § 848.

The majority opinion finds Article 48 to be an "anachronism." 27 M.J. at 107. Maybe it is, for, most certainly, Congress did not amend it at the time it created the office of Military Judge. In addition, my experience as a judge of this Court leads me to conclude that Congress should give the military judge some limited summary contempt powers that are clearly applicable to military and civilian persons alike. Contempt proceedings really are not required to deal with a military member, which may account for the paucity of cases concerning the matter. If the contemner is a military person, Articles 89, 90, and 91, as well as Articles 133 and 134, UCMJ, 10 U.S.C. §§ 889, 890, 891, 933, and 934, respectively, provide ample authority for dealing with the contemptuous conduct and handle it much more severely than does Article 48.

I am disappointed that the majority relies on *Sacher v. United States*, 343 U.S. 1, 72 S.Ct. 451, 96 L.Ed. 717 (1952), a pro-judge decision,[2] to conclude that the military

1. I do not intend to imply that all civilian practitioners are disrespectful in court-martial proceedings, as most certainly are not. I cannot overlook the fact, however, that military judges are often confronted with problems dealing with civilian attorneys, such as: (1) getting them to trial; (2) getting timely compliance with motion practices; and (3) getting some civilian lawyers to acknowledge that they have agreed to work on the case. While a military judge has an arsenal of weapons with which to deal with disrespectful military members, there

is little he can do to a civilian. I hope this decision does not entirely emasculate military judges' positions.

2. In *Sacher v. United States*, 343 U.S. 1, 12–13, 72 S.Ct. 451, 456–57, 96 L.Ed. 717 (1952), the majority decision stated:

> That contempt power over counsel, summary or otherwise, is capable of abuse is certain. Men who make their way to the bench sometimes exhibit vanity, irascibility, narrowness, arrogance, and other weaknesses to which hu-

judge here committed reversible error. I feel his performance was outstanding! I believe it is an unwarranted misuse of the *Sacher* decision, a use which might lead readers to unjustifiably believe that the contempt procedures set forth in R.C.M. 809(c), Manual for Courts-Martial, United States, 1984, or paragraph 118, Manual for Courts-Martial, United States, 1969 (Revised edition), are unlawful, unconstitutional, and unfair to an accused.

*Sacher* stands for the simple proposition that it is not prejudicial error to accumulate contempt citations and deal with them at the end of a trial. There, the contemners urged the Court to declare that the judge had to deal with the contempts as they occurred instead of waiting until the trial was done. This proposition was rejected and the language quoted by the majority opinion (27 M.J. at 106) was the justification for the rejection. I do not read *Sacher* as establishing a singular, constitutionally-correct way in which to deal with contempt. The case recognizes that the trial judge is in the best posture to deal with contempt in a manner consistent with running an orderly proceeding, thereby guaranteeing an accused the right to a fair trial. The majority twists this around to find that if a court deals with the contempt as it occurs then, somehow, an accused is denied the right to a fair trial.

Article 36, UCMJ, 10 U.S.C. § 836, granted unto the President the power to make rules governing trial procedures. Paragraph 118, 1969 Manual, *supra*, is clearly procedural. Because it is not constitutionally infirm, I see no reason to reverse this case where the court-martial followed the rules. Most likely, had the military judge elected to wait until after the sentencing verdict was announced to deal with what he believed to be contempt, appellant would now be arguing that the judge disobeyed the Manual provision and, therefore, we must reverse. C A T C H 2 2 !!

Lastly, in any event, what transpired was harmless beyond any reasonable doubt, so I dissent. Art. 59(a), UCMJ, 10 USC § 859(a). Indeed, an argument can be advanced that appellant benefited from the contempt proceedings as the court members had an opportunity to direct any hostility they may have had for the contemptuous lawyer directly at that individual and not at appellant. I trust these military officers to have enough honor and good sense not to punish an accused for the contemptuous conduct of his lawyer.[3] There is nothing in the record to suggest that this appellant's sentence, considering his pleas of guilty, was tainted. Quite the contrary, the sentence he received included 4 years' confinement, which is a significant contrast to the authorized maximum punishment of life imprisonment for his heinous crimes of robbery and kidnapping.

---

man flesh is heir. Most judges, however, recognize and respect courageous, forthright lawyerly conduct. They rarely mistake overzeal or heated words of a man fired with a desire to win, for the contemptuous conduct which defies rulings and deserves punishment. They recognize that our profession necessarily is a contentious one and they respect the lawyer who makes a strenuous effort for his client.

The profession knows that no lawyer is at the mercy of a single federal trial judge. These lawyers have not been condemned, as they claim, merely by the impulse of one lone and hostile judge. Their conduct has been condemned by every judge who has examined this record under a duty to review the facts. It is doubted whether the profession will be greatly terrorized by punishment of some of its members after such extended and detached consideration. Moreover, if power of contempt excites fear and terror in the bar, it

would hardly be relieved by upholding petitioners' contention that the judge may proceed against a lawyer at the precise moment of maximum heat but may not do so if he awaits a cooler second thought.

3. The military judge instructed the members that they could not consider the contempt in any way against appellant. He told them:

Members of the court, I want to stress very strongly that what occurred between Mister Cohen and the court has absolutely no bearing on what sentence you should adjudge his client, and should in no way detract from any credence of any argument that Mister Cohen might present on behalf of his client; that's an entirely separate matter. This accused is to be sentenced based on the testimony and evidence that you have heard today, and not on any conduct of counsel.